EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Banco Popular de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Cable Media of Puerto Rico, Inc.;<br>Kenneth S. Krans Negrón<br><br>Recurridos | Certiorari<br><br>2025 TSPR 1<br><br>215 DPR ___ |

Número del Caso:  CC-2023-0684

Fecha:  7 de enero de 2025

Tribunal de Apelaciones:

    Panel VII

Representantes legales de la parte peticionaria:

    Lcda. Áurea Y. Rivera Alvarado
    Lcda. Noelia Pérez García

Representantes legales de la parte recurrida:

    Lcdo. Roberto E. Berríos Falcón

Materia:  Equal Credit Opportunity Act: Protecciones conferidas por la referida Ley a los solicitantes de préstamos.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Banco Popular de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Cable Media of Puerto Rico, Inc.; Kenneth S. Krans Negrón<br><br>Recurridos | CC-2023-0684 | Certiorari |

Opinión del Tribunal emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 7 de enero de 2025.

En esta ocasión, este Tribunal tiene la tarea de reiterar ciertos conceptos básicos de nuestro ordenamiento, tales como los fundamentos que rigen la resolución de controversias por la vía sumaria y el análisis bajo el cual se adjudica la validez de los actos de una persona jurídica. Más importante aún, la controversia ante nuestra consideración nos provee el escenario ideal para explorar, por primera vez, las protecciones conferidas por el Equal Credit Opportunity Act (ECOA), infra, a los solicitantes de préstamos, como también los preceptos específicos que guían su aplicación. Con este trasfondo en mente, veamos el cuadro fáctico dentro del cual se desarrolló esta controversia.

# I

La controversia que hoy atiende este Tribunal tuvo su génesis en una <u>Demanda</u> sobre cobro de dinero que instó el Banco Popular de Puerto Rico (BPPR) en contra de Cable Media of Puerto Rico, Inc. (Cable Media) y el Sr. Kenneth S. Krans Negrón (señor Krans Negrón) (en conjunto, los Recurridos). En esta, el BPPR alegó que Cable Media suscribió un <u>Pagaré de Flexilínea</u> el 10 de noviembre de 2006 para un préstamo de $150,000.00, el cual el señor Krans Negrón garantizó con su firma en el documento de <u>Garantía ilimitada y continua</u>. Añadió que, el 1 de octubre de 2019, Cable Media suscribió un <u>Pagaré Línea de Crédito Cancelada Flexilínea</u> para efectuar un acuerdo de pago por el balance adeudado. Indicó que los Recurridos habían dejado de pagar las mensualidades, por lo que adeudaban $146,633.79, más $17,118.35 en intereses.

Posteriormente, el BPPR presentó una <u>Moción de sentencia sumaria</u> en la cual argumentó, en esencia, que la evidencia documental había demostrado que los Recurridos habían incumplido con sus obligaciones contractuales.[1]

---

[1]El BPPR acompañó su solicitud con un <u>Requerimiento de Admisiones</u> dirigido a Cable Media que exigía la admisión de lo siguiente:

1. Admita que el 10 de noviembre de 2006, usted, por conducto de su Presidente Kenneth S. Krans Negrón, suscribió un documento tituldo "<u>Pagaré de Flexilínea</u>", por la cantidad de $150,000.00

2. Admita que el 1 de octubre de 2019, usted, por conducto de su Presidente Kenneth S. Krans Negrón, suscribió [un] documento titulado "<u>Pagaré de Línea de Crédito Cancelada Flexilínea</u>", por la cantidad de $146,767.03.

En su Contestación a la demanda, Cable Media negó que la deuda fuera líquida y exigible. Además, cuestionó la autoridad legal del señor Krans Negrón para firmar los acuerdos antes mencionados a nombre de la corporación.

Por su parte, el señor Krans Negrón instó una Contestación a demanda y Reconvención mediante la cual negó que adeudara dinero al BPPR o que hubiera incumplido con alguna obligación. Arguyó que el BPPR violentó las exigencias del Equal Credit Opportunity Act (ECOA), infra, al requerirle como accionista de Cable Media que firmara la garantía personal sin proveer fundamento alguno para ello. Alegó que el BPPR discriminó en su contra por razón de su condición como accionista, por lo que la garantía personal era nula. En la alternativa, sostuvo que el nuevo contrato de financiamiento tornó más onerosa la obligación original.

Tras ciertos trámites procesales adicionales, el BPPR presentó una Moción de desestimación de reconvención en la cual argumentó que la reclamación del señor Krans Negrón era improcedente debido a la inaplicabilidad de tal estatuto a los préstamos otorgados a personas jurídicas y porque la condición de accionista no se considera una categoría

---

3. Admita que en relación al Préstamo número 101-2351463-8801 y objeto de la presente Demanda, se ha dejado de pagar las mensualidades del Préstamo. Apéndice de Petición de certiorari, págs. 37-38.

   Eventualmente, mediante una Moción en cumplimiento de orden y notificando posición, **Cable Media indicó que no se oponía a que se dieran por admitidos los requerimientos antes descritos.** Íd., pág. 58.

protegida. Añadió que el ECOA no proveía el remedio de anulación y que, aún si aplicara, cualquier reclamación estaba prescrita.

De otro lado, en su Oposición a "moción de sentencia sumaria", Cable Media arguyó que aún persistían controversias materiales relacionadas con la autorización del señor Krans Negrón para obligar a la corporación, es decir, sobre su capacidad como firmante en el pagaré.

En su Réplica, el BPPR señaló que, el 10 de noviembre de 2006, cuando el señor Krans Negrón suscribió el pagaré como presidente de Cable Media, se acreditó su capacidad representativa mediante un Certificado de resolución. Indicó que tal documento autorizó al señor Krans Negrón a otorgar los documentos necesarios para consumar el pagaré original y la facilidad de repago. Añadió que, durante tal trámite, se llevaron a cabo varias conversaciones entre el BPPR y el señor Krans Negrón para explorar alternativas de pago, en las cuales la conducta de este último reflejó su autoridad representativa aparente sobre la corporación. Indicó que Cable Media no había alegado que tal autorización había sido revocada como tampoco había presentado evidencia alguna que demostrara que, a tal fecha, el señor Krans Negrón no podía representarle.

Por su parte, el señor Krans Negrón instó una Oposición a moción de desestimación mediante la cual afirmó que la ECOA aplica a corporaciones y a financiamientos comerciales. Reiteró que el BPPR discriminó en su contra al exigirle una

garantía personal cuando Cable Media cualificaba para la suma y los términos de crédito. Negó, además, que la reclamación estuviera prescrita toda vez que, al enmendar los términos de la relación de crédito en el 2019 y crear una obligación aún más onerosa, comenzó un nuevo término de cinco (5) años.

El 7 de junio de 2023, el Tribunal de Primera Instancia emitió una Sentencia. En esta, declaró ha lugar la solicitud de sentencia sumaria del BPPR y ordenó a los Recurridos a pagar $146,633.79 por concepto del principal, $17,118.35 de intereses acumulados y $5,000.00 en honorarios de abogados y costas. En cuanto a la Reconvención del señor Krans Negrón, determinó que esta estaba prescrita, pues la garantía fue firmada en el 2006.

En desacuerdo, los Recurridos acudieron ante el Tribunal de Apelaciones mediante un recurso de Apelación. En síntesis, argumentaron que de ninguno de los documentos que acompañaron la solicitud de sentencia sumaria del BPPR surgía fehacientemente la capacidad representativa del señor Krans Negrón para firmar los documentos de préstamo a nombre de Cable Media. En cuanto a la Reconvención, insistieron en que la ECOA era aplicable al caso del señor Krans Negrón y que su reclamación bajo tal estatuto no estaba prescrita, pues ocurrió una novación de los términos en el 2019.

Por su parte, el BPPR sostuvo que del expediente surgía evidencia documental que acreditaba la capacidad representativa del señor Krans Negrón para actuar a nombre de Cable Media y vincularla, así como también surgía de todos

los actos realizados que representaron su autoridad para ello. Además, afirmó que no existía causa de acción bajo el ECOA y que, de todas formas, estaba prescrita debido a que se trató de una garantía continua que no se renovó con el segundo pagaré, pues no se trató de una nueva extensión de crédito sino de una obligación existente que permitía cambios a sus condiciones.

El 31 de agosto de 2023, el Tribunal de Apelaciones emitió una Sentencia mediante la cual revocó el dictamen del Tribunal de Primera Instancia. En síntesis, el foro intermedio determinó que existían hechos materiales en controversia que impedían la adjudicación sumaria, en específico, aquellos relacionados con la capacidad del señor Krans Negrón para firmar los pagarés y obligar a Cable Media, pues el BPPR no había acompañado su solicitud de sentencia sumaria con documento alguno al respecto. En cuanto a la reconvención del señor Krans Negrón, concluyó que persistía controversia sobre cuándo comenzó a transcurrir el término prescriptivo para presentar la reclamación bajo el ECOA. Por lo tanto, ordenó la celebración de un juicio en su fondo.

Inconforme, el BPPR presentó una Moción de reconsideración en la cual sostuvo que del expediente se desprendía evidencia de la autorización al señor Krans Negrón por parte de Cable Media para representarle y contratar a su nombre. Señaló, además, que procedía la desestimación de la reconvención ya que no le negó la extensión de crédito al señor Krans Negrón, y que ser accionista no es una categoría

protegida. También subrayó que este último firmó la garantía hacía más de una década antes de su reclamo. El foro apelativo intermedio la declaró no ha lugar.

Así las cosas, el BPPR acudió ante este Tribunal mediante una Petición de certiorari. En esta, reafirmó que el expediente contenía documentación suficiente para acreditar la capacidad representativa del señor Krans Negrón para obligar a Cable Media, desde el Certificado de resolución hasta sus propios actos durante el trámite de la línea de crédito. Asimismo, argumentó que era imposible que procediera reclamación alguna bajo la ECOA debido a que, aún si el señor Krans Negrón tuviera un reclamo válido de discrimen, la causa de acción estaba prescrita.

De su lado, los Recurridos comparecieron a través de un Alegato en el que arguyeron que de la Moción de sentencia sumaria que presentó el BPPR no surgía fehacientemente la capacidad representativa del señor Krans Negrón para firmar los documentos del préstamo a nombre de Cable Media. En cuanto al reclamo bajo la ECOA, sostuvieron que tal estatuto aplica en casos de corporaciones y que no puede estar prescrito porque el BPPR enmendó los términos del préstamo a condiciones más onerosos. Finalmente, reiteraron que el BPPR discriminó al exigir una garantía personal del señor Krans Negrón.

Trabada así la controversia, tras la expedición del auto solicitado y la comparecencia de las partes, procedemos a

resolver el asunto, no sin antes repasar el Derecho aplicable a la controversia.

## II

### A.

La sentencia sumaria es el mecanismo procesal adecuado para resolver casos en los que no es necesaria la celebración de un juicio por no existir duda sobre los hechos esenciales, contarse con toda la evidencia necesaria y solo restar la aplicación del derecho. 32 LPRA Ap. V, R. 36.3(e); Lugo Montalvo v. Sol Meliá Vacation, 194 DPR 209, 225 (2015); Córdova Dexter v. Sucn. Ferraiuoli, 182 DPR 541, 555-556 (2011).

Para poder dictar sentencia sumariamente, la parte promovente debe demostrar "la inexistencia de una controversia sustancial de hechos esenciales y pertinentes". 32 LPRA Ap. V, R. 36.1-36.2. Al respecto, un hecho material esencial y pertinente es aquel que puede afectar el resultado de la reclamación de conformidad con el derecho sustantivo aplicable. Mejías et al. v. Carrasquillo et al., 185 DPR 288, 300 (2012) (citas omitidas).

Por otro lado, la parte que se opone a que se dicte sentencia sumariamente "no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar de forma tan detallada y específica como lo haya hecho la parte promovente". Mun. de Añasco v. ASES et al., 188 DPR 307, 328 (2013). "Para eso, la parte opositora 'estará obligada a demostrar que tiene

prueba para sustanciar sus alegaciones'". Íd., (citando a Abrams Rivera v. E.L.A., 178 DPR 914, 933 (2010)).

Ahora bien, este Tribunal ha pautado que el foro apelativo intermedio se encuentra en la misma posición que el Tribunal de Primera Instancia al momento de revisar solicitudes de sentencia sumaria. Meléndez González et al. v. M. Cuebas, 193 DPR 100, 118 (2015); Vera v. Dr. Bravo, 161 DPR 308, 334 (2004). Entiéndase, le corresponde al foro apelativo realizar una evaluación de novo. Meléndez González et al. v. M. Cuebas, supra, pág. 116 (citas omitidas). Para ello, es indispensable "analizar tanto los documentos que acompañan la solicitud como los documentos de la oposición para determinar si existe o no controversia de hechos". Rosado Reyes v. Global Healthcare, 205 DPR 796, 809 (2020).

Es decir, como parte de nuestra función revisora, debemos evaluar todos los documentos que obren en el expediente de modo que, previo a determinar la procedencia de una solicitud de sentencia sumaria, realicemos un "balance adecuado entre el derecho de todo litigante a tener su día en corte y la disposición justa, rápida y económica de los litigios civiles". Íd., pág. 808. (citas omitidas).

En consecuencia, el tribunal podrá dictar sentencia sumaria si de "**las alegaciones, deposiciones, contestaciones a interrogatorios, admisiones, declaraciones juradas, y de cualquier otra evidencia ofrecida, surja que no existe controversia real y sustancial en cuanto a algún hecho material y que, como cuestión de derecho, proceda dictar**

**sentencia sumaria a favor de la parte promovente**". (Negrillas suplidas). Lugo Montalvo v. Sol Meliá Vacation, supra, pág. 225.

Ahora bien, según lo estableció este Tribunal en SLG Zapata-Rivera v. J.F. Montalvo, 189 DPR 414, 433-34 (2013), debido a que son "quienes conocen de primera mano sus respectivas posiciones, así como la evidencia disponible en el caso", las partes tienen "el deber de identificar cada uno de los hechos que estiman relevantes, al igual que la prueba admisible que los sostiene", para, de este modo, "poner al tribunal en posición de evaluar conjuntamente las versiones encontradas para cada uno de los hechos refutados a la luz de las referencias a la prueba que alegadamente los apoya".

De otro lado, los hechos particulares de este caso requieren que distingamos el mecanismo de la sentencia sumaria del de la moción de desestimación. Nuestro ordenamiento procesal civil permite que una persona contra quien se haya presentado un reclamo judicial solicite su desestimación cuando de las alegaciones de la demanda surja alguna defensa afirmativa que derrotaría la pretensión del demandante. Eagle Security v. Efrón Dorado et al., 2011 DPR 83 (2023) (citando la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V); Trans-Oceanic Life Ins. v. Oracle Corp., 184 DPR 689, 701 (2012). Específicamente, y en lo pertinente a este caso, en virtud de la Regla 10.2(5) de Procedimiento Civil, supra, se viabiliza que la parte demandada puede

fundamentar la desestimación invocando la defensa de que la petición judicial deja de exponer una reclamación que justifique la concesión de un remedio. Bajo ese escenario, la desestimación pretendida se dirige a los méritos de la controversia y no a los aspectos procesales del caso. Montañez v. Hosp. Metropolitano, 157 DPR 96, 104 (2002).

Consecuentemente, nuestros pronunciamientos jurisprudenciales han establecido que, al resolver una solicitud de desestimación bajo el fundamento de que se deja de exponer una reclamación que justifique un remedio, los tribunales están obligados a tomar como ciertos, y de manera más favorable para el demandante, todos los hechos bien alegados en la demanda y que hayan sido aseverados de manera clara y concluyente. Eagle Security v. Efrón Dorado et al., supra (citando a González Méndez v. Acción Social et al., 196 DPR 213, 234 (2016)); Rivera Sanfeliz et al. v. Jta. Dir. FirstBank, 193 DPR 38, 49 (2015). Asimismo, están llamados a interpretar las alegaciones en forma conjunta y liberal, de la manera más beneficiosa posible para la parte que prosigue la acción. González Méndez v. Acción Social et al., supra, pág. 234.

Al respecto, hemos resuelto que para que proceda una moción de desestimación de esta naturaleza tiene que demostrarse de forma certera que el demandante no tiene derecho a remedio alguno bajo cualquier estado de Derecho que se pudiese probar en apoyo a su reclamación, incluso interpretándose la demanda lo más liberalmente a su favor.

Casillas Carrasquillo v. ELA, 209 DPR 240, 247 (2022); Ortiz Matías et al. v. Mora Development, 187 DPR 649, 654 (2013); Colón v. Lotería, 167 DPR 625, 649 (2006). Entiéndase, los tribunales deben determinar si, a la luz de la situación más favorable al demandante, y resolviendo toda duda a su favor, la demanda es suficiente para constituir una reclamación válida. Casillas Carrasquillo v. ELA, supra.

**B.**

La Ley de Corporaciones, Ley Núm. 164-2009, según enmendada, 14 LPRA sec. 3501 et seq., representa en nuestro ordenamiento "el estatuto especial por virtud del cual se deben atender los cuestionamientos relativos a la existencia y vida jurídica de las corporaciones privadas". Eagle Sec. Police, Inc. v. Dorado, 211 DPR 70, 85 (2023). Bajo tal ley, una vez se otorga, presenta y registra el certificado de incorporación en el Departamento de Estado, junto con el pago de los derechos correspondientes, el Estado "está en posición de emitir el certificado de incorporación, el cual es una especie de certificado de nacimiento que evidencia y oficializa la existencia de la persona jurídica que es la corporación". C.E. Díaz Olivo, Corporaciones: tratado sobre derecho corporativo, 2.a ed. rev., Colombia, Ed. Nomos, 2022, págs. 103-104.

Desde Sabalier Sabalier v. Iglesias Pantín, 34 DPR 352 (1925), este Tribunal ha reconocido que, por ser una corporación un organismo artificial e intangible que existe solamente en correspondencia con la ley, todos sus actos

tienen que celebrarse en representación suya por vía de agentes. Gasolinas PR v. Registrador, 155 DPR 652, 665-66 (2001). Según lo explica el Profesor Díaz Olivo, una corporación se obliga a través de sus oficiales, ya sea: en virtud de la autoridad que los estatutos corporativos le hayan conferido; por autorización expresa otorgada mediante resolución corporativa; por autorización implícita; por autoridad aparente; o en casos muy limitados, por virtud de cierta facultad inherente a su cargo. C. Díaz Olivo, Corporaciones, San Juan, Pubs. Puertorriqueñas, 1999, págs. 93-95.

En lo que nos concierne, en aquellos casos en los que "la autoridad de un oficial de la corporación ha sido conferida expresamente por una resolución corporativa, es necesario que dicha resolución describa adecuadamente las facultades específicamente concedidas y los actos autorizados, además de las circunstancias personales que posibiliten la identificación adecuada del representante". Gasolinas P. R. v. Registrador, supra, pág. 666 (citando a S. Torres Peralta, El Derecho Notarial Puertorriqueño, ed. especial, San Juan, Pubs. S.T.P., 1995, pág. 8.).

De otra parte, en lo que respecta a la autoridad aparente, esta "solo existe o se reconoce con relación a terceras personas; esto es, la autoridad que personas ajenas a la corporación pueden razonablemente entender que un oficial corporativo posee en vista de la conducta y el

desempeño en la corporación". C.E. Díaz Olivo, *op. cit.*, págs. 195-196.

## C.

Durante la década de los 70, el Congreso de los Estados Unidos de América fue informado de prácticas discriminatorias prevalentes en la concesión y extensión de préstamos y crédito, particularmente sobre cómo estas resultaban en la inhabilidad de las mujeres para obtener crédito con la misma facilidad que los hombres. J. D. Stafford, Consumer Protection: The Equal Credit Opportunity Act: Guarantors as applicants-did the cost of a violation go up?, 40 Okla. LRev. 431 (1987). El ejemplo más prominente de tal práctica era obligar a las mujeres a que sus esposos sirvieran como garantizadores mediante sus firmas en instancias en que estas solicitaban la concesión de crédito por sí solas. Mayes v. Chrysler Credit Corp., 37 F.3d 9 (1st Cir. 1994).

Eventualmente, ello condujo a la aprobación del Equal Credit Opportunity Act, 15 USC sec. 1691 et seq. (ECOA), cuyo fin original era proteger a las mujeres mediante la prohibición a instituciones financieras de negarles la concesión de crédito por razones de género o estatus marital. Miller v. American Express Co., 688 F.2d 1235, 1239 (9th Cir. 1982); Anderson v. United Finance Co., 666 F.2d 1274, 1277 (9th Cir.1982) (citando a Markham v. Colonial Mortgage Service Co., 605 F.2d 566, 569 (D.C. Cir. 1979)). Desde entonces, la finalidad del ECOA es asegurar que no se niegue crédito a solicitante alguno por factores que no están

relacionados con su capacidad financiera para justificar la extensión de crédito. E. O'Connor Tomlinson, <u>Proof of Violation of Equal Credit Opportunity Act (ECOA)</u>, 142 Am. Jur. Proof of Facts 3d 259 (2014).

En su estado actual, la ECOA decreta que es impermisible que cualquier institución financiera o prestamista discrimine contra algún solicitante en cualquier aspecto de una transacción de crédito por razón de su: **raza, color, religión, origen nacional, sexo o estatus marital, o edad si el solicitante tiene capacidad para contratar**. 15 USC sec. 1691 (a)(1). Así también lo establece su reglamento, <u>Regulation B</u> (Reglamento B):

> The purpose of this regulation is to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age (provided the applicant has the capacity to contract); to the fact that all or part of the applicant's income derives from a public assistance program; or to the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act. **The regulation prohibits creditor practices that discriminate on the basis of any of these factors**. 12 CFR sec 202.1 (b). (Negrillas suplidas).

En fin, el discrimen que busca prohibir el estatuto, según definido por el reglamento antes citado, es aquel dirigido a un solicitante "**on a prohibited basis** regarding any aspect of a credit transaction". 12 CFR sec 202.4 (a). (Negrillas suplidas). Por supuesto, "on a prohibited basis" se relaciona con las clases protegidas antes mencionadas, pues, "[a]s its name suggests, the purpose of the statute is **to provide an equal opportunity for credit to certain**

**protected classes**". M. J. Svoboda, <u>The Evolution of Redlining Post-Financial Crisis and Best Practices for Financial Institutions</u>, 22 N.C. Banking Inst. 67, 70 (2018). (Negrillas suplidas).

En lo relacionado con la acción aquí en disputa, a saber, el requerir la firma de un tercero como garantía en el préstamo o extensión de crédito, el Reglamento B dispone, en lo pertinente, lo siguiente:

(d) Signature of spouse or other person—

(1) Rule for qualified applicant. Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested. A creditor shall not deem the submission of a joint financial statement or other evidence of jointly held assets as an application for joint credit.

(2) Unsecured credit. If an applicant requests unsecured credit and relies in part upon property that the applicant owns jointly with another person to satisfy the creditor's standards of creditworthiness, the creditor may require the signature of the other person only on the instrument(s) necessary, or reasonably believed by the creditor to be necessary, under the law of the state in which the property is located, to enable the creditor to reach the property being relied upon in the event of the death or default of the applicant.

(3) Unsecured credit—community property states. If a married applicant requests unsecured credit and resides in a community property state, or if the applicant is relying on property located in such a state, a creditor may require the signature of the spouse on any instrument necessary, or reasonably believed by the creditor to be necessary, under applicable state law to make the community property available to satisfy the debt in the event of default if:

(i) Applicable state law denies the applicant power to manage or control sufficient community

property to qualify for the credit requested under the creditor's standards of creditworthiness; and

(ii) The applicant does not have sufficient separate property to qualify for the credit requested without regard to community property.

(4) Secured credit. If an applicant requests secured credit, a creditor may require the signature of the applicant's spouse or other person on any instrument necessary, or reasonably believed by the creditor to be necessary, under applicable state law to make the property being offered as security available to satisfy the debt in the event of default, for example, an instrument to create a valid lien, pass clear title, waive inchoate rights, or assign earnings.

(5) Additional parties. If, under a creditor's standards of creditworthiness, the personal liability of an additional party is necessary to support the credit requested, a creditor may request a cosigner, guarantor, endorser, or similar party. The applicant's spouse may serve as an additional party, but the creditor shall not require that the spouse be the additional party.

(6) Rights of additional parties. A creditor shall not impose requirements upon an additional party that the creditor is prohibited from imposing upon an applicant under this section.

(e) Insurance. A creditor shall not refuse to extend credit and shall not terminate an account because credit life, health, accident, disability, or other credit-related insurance is not available on the basis of the applicant's age. 12 CFR sec. 202.7.

Ahora bien, la ECOA reconoce una causa de acción por los actos discriminatorios antes detallados y el consenso a nivel federal es que la persona agraviada puede alegar la violación al estatuto mediante una reconvención. Riggs National Bank v. Linch, 829 F.Supp. 163, 169 (1993). Sin embargo, la mayoría de estos tribunales ha concluido que una violación a la ECOA no puede invocarse como defensa afirmativa con el fin de liberar al demandado agraviado de la deuda contraída. CMF Virginia Land, L.P. v. Brinson, 806 F.Supp. 90, 95 (1992). Por consiguiente, los remedios disponibles para esta causa

de acción se limitan a los daños reales, los daños punitivos y los honorarios de abogado. 15 USCA sec. 1691e.

Finalmente, si bien el término prescriptivo para tal causa de acción era originalmente dos (2) años, este fue enmendado en el 2010 mediante el Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub L. No. 111-203 sec. 1085(7) 124 Stat. 1376, 2085 (2010), el cual entró en vigor en el 2011. A partir de tal enmienda, la disposición relacionada con el término prescriptivo lee como sigue: "[n]o such action shall be brought later than **5 years after the date of the occurrence of the violation**". 15 USCA sec. 1691e. (Negrillas suplidas).

Expuesto el Derecho pertinente, procedemos a discutir su aplicación a esta controversia.

### III

Según se adelantó, por tratarse de una sentencia sumaria, este Tribunal debe evaluar de novo y en primer término las solicitudes a favor y en contra de tal proceder, junto con la prueba documental que obra en el expediente. Tal ejercicio tiene el fin de determinar si los foros recurridos actuaron correctamente con respecto a ello. En específico en este caso, si procedía la sentencia sumaria según lo dictaminó el Tribunal de Primera Instancia o si, por el contrario, el Tribunal de Apelaciones estuvo correcto al concluir que existían controversias que requerían la celebración de un juicio.

De entrada, el BPPR y Cable Media cumplieron con los requisitos reglamentarios en sus respectivos escritos. Sobrepasado este asunto, corresponde entonces evaluar si procedía la resolución sumaria de la controversia sobre cobro de dinero. Un análisis detenido de la documentación que surge del expediente ante nuestra consideración nos obliga a concluir en la afirmativa.[2] Veamos.

---

[2] Si bien el Tribunal de Primera Instancia no emitió determinaciones de hecho al amparo de Pérez Vargas v. Office Depot, 203 DPR 687 (2019), y el Tribunal de Apelaciones revocó la concesión de la sentencia sumaria a favor del BPPR, este último emitió ciertas determinaciones de hecho que, a juicio de este Tribunal, justifican la procedencia del remedio solicitado y, por ende, se adoptan según se transcriben a continuación:

1. Cable Media es una corporación organizada y existente bajo las leyes del Estado Libre Asociado de Puerto Rico, inscrita bajo el número de registro 101607 en el Departamento de Estado de Puerto Rico. Su Presidente es el señor Krans Negrón.

2. El día 10 de noviembre de 2006, el señor Krans Negrón suscribió un Pagaré FlexiLínea mediante el cual BPPR le extendió a Cable Media un préstamo por la suma principal de $150,000.00 (en adelante Préstamo número 101-2351463-8801), a ser utilizado bajo los términos y condiciones establecidos en dicho documento. Dicho préstamo devengaría intereses fluctuantes a razón del 2.50% sobre el "Prime Rate" hasta la Fecha de Vencimiento.

3. El 13 de julio de 2006, el señor Krans Negrón firmó el documento Garantía ilimitada y continua, reconocida mediante affidávit número 2781 ante el Notario Juan Manuel Casanova Rivera.

4. El 1ro de octubre de 2019, el señor Krans Negrón suscribió un Pagaré Línea de Crédito Cancelada FlexiLínea, en virtud del cual BPPR le extendió a Cable Media un acuerdo de pago por el balance adeudado de $146,767.03 a ser

A modo de repaso, el BPPR presentó una solicitud de sentencia sumaria reclamando el balance adeudado de la línea de crédito que extendió a Cable Media. Según se relató, el 10 de noviembre de 2006, Cable Media compareció en un Pagaré de Flexilínea mediante el cual el BPPR le prestó la suma principal de $150,000.00 con una tasa de interés de 2.50%. Este fue suscrito por el señor Krans Negrón, identificado en tal documento como presidente de Cable Media.[3]

Un poco antes, el 13 de julio de 2006, el señor Krans Negrón suscribió un documento intitulado Garantía Ilimitada y Continua ante el BPPR con el fin de que la institución bancaria concediera préstamos u otros instrumentos negociables a Cable Media.[4]

Finalmente, el 1 de octubre de 2019, las partes nuevamente convinieron en un Pagaré Línea de Crédito Cancelada Flexilínea. Según se desprende de tal documento, este se extendió como plan de pago sobre el balance originalmente adeudado de $146,767.03. Nuevamente, este fue firmado por el señor Krans Negrón, así identificado como presidente de la corporación que se obligaba.[5]

---

utilizado para propósitos y bajo los términos y condiciones negociados. Dicho Préstamo devengaría intereses fluctuantes a razón de 2.50% sobre el "Prime Rate". Apéndice de certiorari, pág. 183.

[3] Íd., págs. 22-23.

[4] Íd., pág. 26.

[5] Íd., págs. 24-25.

Conforme se indicó, el foro primario concedió la resolución sumaria solicitada por el BPPR en la acción de cobro de dinero, pero el Tribunal de Apelaciones revocó su dictamen. Tal foro determinó que el BPPR "no anejó a su Moción de sentencia sumaria documento alguno que evidenciara la capacidad representativa de Cable Media, del firmante y del señor Krans Negrón para obligar a la Corporación Cable Media mediante la firma de ambos pagarés".[6]

Ahora bien, en su comparecencia ante este Tribunal, el BPPR sostiene que, no solo existe una resolución corporativa en el expediente que autoriza al señor Krans Negrón a actuar en nombre de Cable Media en lo relacionado con la facilidad de crédito, sino que también se desprenden del expediente varias comunicaciones en las que este actuó con respecto a la deuda de Cable Media y le representó al BPPR, como tercero ajeno, que tenía la autoridad para ello. A esto añadió que, como presidente de la corporación, el señor Krans Negrón también tenía la capacidad inherente para ello y que Cable Media se benefició de sus actos.

Por su parte, los Recurridos sostienen que el BPPR no demostró que el señor Krans Negrón estaba autorizado para representar y obligar a Cable Media.

En primer lugar, un examen del expediente revela un documento notarizado intitulado Certificado de resolución, con fecha de 9 de noviembre de 2006 y suscrito por el Sr.

---

[6] Íd., pág. 183.

Adolfo Krans Bell, quien se identifica como el secretario de Cable Media. Este certifica:

Que en la reunión de la Junta de Directores de la Corporación, a la cual asistió y actuó el quórum reglamentario y el que determina la ley, se presentó y aprobó la siguiente resolución:

"RESU[É]LVASE, por la presente autorizar a su presidente Kenneth Krans Negrón, para que a su nombre y en representación de la Corporación efectúe los siguientes actos: (a) gestione y obtenga del Banco Popular de Puerto Rico (el "Banco") una línea de crédito por la suma de $150,000 bajo aquellos términos y condiciones que estime convenientes y necesarios; (b) expida pagaré de evidencia de dicha facilidad; (c) otorgue y expida documentos o instrumento de préstamo, contrato, de garantía, o de cualquier otra naturaleza, y que sea[n] necesarios para consumar todos los actos autorizados, bajo aquellos términos y condiciones que estime convenientes y necesarios"

Certifico, además, que la transcrita resolución est[á] en pleno vigor y no ha sido enmendada en forma alguna.[7]

Entiéndase, tal documento, el cual constituye una resolución corporativa, confiere autoridad al señor Krans Negrón para que represente a Cable Media y actúe a su nombre, particularmente, en lo relacionado con la línea de crédito extendida por el BPPR. Conforme se indicó previamente, una de las formas mediante las cuales un agente puede actuar por una corporación es por autorización expresa otorgada mediante resolución corporativa. Nuestro ordenamiento exige que tal resolución describa adecuadamente las facultades específicamente concedidas y los actos autorizados, además

---

[7]Íd., pág. 80.

de las circunstancias personales que posibiliten la identificación adecuada del representante.

Como puede verse en la resolución antes citada, el señor Krans Negrón, quien fue identificado además como presidente de Cable Media, fue facultado para: gestionar la línea de crédito de $150,000 bajo los términos y condiciones que estimara convenientes y necesarios; expedir el pagaré de evidencia de dicha facilidad, y otorgar los demás documentos necesarios. Es decir, que tal resolución cumple con: (1) proveer las circunstancias que identificarían al señor Krans Negrón como representante de Cable Media, y (2) describir adecuadamente las facultades específicamente concedidas y los actos autorizados.

Debe remarcarse, además, que no se desprende del expediente que tal resolución corporativa fuera invalidada de manera alguna y, de hecho, en ninguna de sus comparecencias a lo largo de este trámite los Recurridos así lo han alegado. Sin embargo, el foro apelativo intermedio pareció descartar tal documento porque este no fue incluido específicamente en la Moción de sentencia sumaria que presentó el BPPR.

Recordemos, en primer lugar, que los jueces pueden considerar documentos que obren en autos, independientemente de si se hicieron formar o no parte de la solicitud. Mejías et al. v. Carrasquillo et al., supra, pág. 300. En segundo lugar, y más importante aún, en este caso el BPPR fue diligente con el requisito de presentar todos los documentos y hechos pertinentes en su solicitud de sentencia sumaria,

según establecido en <u>SLG Zapata-Rivera v. J.F. Montalvo</u>, supra. Es decir, el BPPR cumplió toda vez que anejó tal <u>Certificación de resolución</u> a su <u>Réplica a oposición de sentencia sumaria</u>, la cual constituyó un escrito complementario a la solicitud original y estuvo dirigido al mismo fin de colocar el Tribunal en posición de adjudicar de forma sumaria todos los hechos pertinentes.

Por si ello fuera poco, cabe destacar que Cable Media no se opuso a que se dieran por admitidos los requerimientos cursados por el BPPR e, incluso, indicó que: "[e]n específico, se admite que el codemandado Kenneth S. Krans Negrón, fungiendo como Presidente de Cable Media, suscribió los documentos detallados en dichos requerimientos de admisión, y que Cable Media se atrasó en los pagos mensuales pactados del préstamo allí detallado".[8] A ello se suma la cadena de comunicaciones intercambiadas entre agentes del BPPR y el señor Krans Negrón, a nombre de Cable Media, en las cuales se dialogó sobre diversos aspectos de la línea de crédito.[9]

En consecuencia, este Tribunal debe concluir que la documentación que obra en el expediente demuestra inequívocamente que el señor Krans Negrón estaba autorizado para actuar a nombre de Cable Media y obligarle con la línea de crédito extendida por el BPPR. Contrario a lo determinado por el Tribunal de Apelaciones, la capacidad representativa

---

[8] Íd., pág. 58.

[9] Íd., págs. 98-118.

del señor Krans Negrón fue debidamente acreditada, por lo que procedía la resolución por la vía sumaria de la controversia relacionada con el cobro de dinero.

Superado este asunto, procede adentrarnos en el segundo aspecto de la controversia: la reconvención del señor Krans Negrón al amparo de las protecciones anti-discrimen de la ECOA. Revisitando el contexto de esta, el foro apelativo intermedio también determinó que no podía resolverse sumariamente la reconvención del señor Krans Negrón bajo el argumento de prescripción debido a que tenía que desfilarse prueba con respecto al tiempo que transcurrió entre el momento en que cambiaron los términos de la relación de crédito y la presentación de la reconvención, así como también sobre si el BPPR exigió tal cambio, a quién y cuándo.

De entrada, cabe señalar que el Tribunal de Primera Instancia desestimó la reconvención. Es decir, que no dispuso de esta bajo el estándar de una sentencia sumaria según lo indicó el Tribunal de Apelaciones y como procedió a evaluarla. Por consiguiente, este Tribunal debe atender la interrogante bajo el estándar de una solicitud de desestimación. Sin embargo, previo a ello, debemos reiterar los hechos a evaluarse.

En cuanto a este segundo aspecto de la controversia, el BPPR sostiene que el señor Krans Negrón carece de reclamo válido alguno bajo la ECOA, pues no le fue denegada la línea de crédito, no es parte de alguna de las clases protegidas,

y, de todas formas, cualquier reclamo al amparo de tal estatuto está prescrito.

Por su lado, los Recurridos insisten en que hubo una novación en los términos del préstamo y, por ende, en la garantía que firmó el señor Krans Negrón, por lo que la reclamación no está prescrita. Afirman, además, que pedir tal garantía personal, como accionista de la corporación solicitante, fue un acto discriminatorio. No les asiste la razón.

El argumento de discrimen que trae el señor Krans Negrón descansa principalmente en la sección del Reglamento B antes citada que prohíbe que una institución financiera pida la firma del esposo o esposa del solicitante u otra persona en algún instrumento de crédito si el solicitante cualifica bajo los estándares de la institución para el crédito. 12 CFR sec. 202.7 (d)(1).

Para empezar, cabe recalcar que la reglamentación no prohíbe expresamente que la institución bancaria requiera un garantizador o co-firmante cuando no apliquen las excepciones contenidas en el estatuto.[10] No obstante, es crucial señalar que, aunque una lectura aislada de tal disposición podría llevar a concluir que el argumento del señor Krans Negrón tiene mérito, ello implicaría descartar en su totalidad el

---

[10]Véase de forma persuasiva, Sec. 9.6. Discrimination prohibited—Specific examples—Sex and marital status, 28 Tex. Prac., Consumer Rights And Remedies § 9.6 (3d ed.).

contexto que proveen el ECOA y el Reglamento B con respecto a tal prohibición.

Debido a ello, es pertinente reiterar que el propósito de la ECOA es garantizar que a un solicitante no se le deniegue una extensión de crédito o préstamo por algún factor que no esté relacionado con su capacidad financiera para adquirirlo. Es decir, proveer igualdad de oportunidades a clases que son protegidas debido al discrimen al que han sido expuestas históricamente. Si bien el ECOA fue originalmente promulgado para proteger a las personas de discrimen a base de sexo o estatus marital, a pocos años después de su creación este fue sujeto de enmiendas para incluir otras categorías específicas cuyo discrimen debía ser prohibido durante el trámite de una solicitud de crédito, a saber: raza, color, religión y origen nacional.

De hecho, según el Reporte del Senado de los Estados Unidos que acompañó esta enmienda en el 1976, es recomendable que, para determinar la existencia de discrimen bajo este estatuto, se recurra a "judicial constructions of anti-discrimination legislation in the employment field". S. REP. 94-589, 4, 1976 USCCAN 403, 406. Desde Mercado-García v. Ponce Fed. Bank, 979 F.2d 890, 893 (1st Cir. 1992), "[t]he First Circuit interprets the ECOA by using the McDonnell Douglas burden-shifting framework used in Title VII employment discrimination cases". Bello v. Puerto Rico, No. CV 17-1120 (JAG), 2017 WL 7361830, (D.P.R. Dec. 14, 2017). Así también lo han hecho consistentemente los tribunales federales,

requiriendo que, como se ha exigido en casos bajo el Equal Employment Opportunity Act, 42 USC sec. 2000e-2 et seq., el principal estatuto federal contra el discrimen en el empleo, la persona **sea miembro de una clase protegida** para reclamar bajo el ECOA.[11]

Tal requisito es el primero en el estándar de evaluación de la Corte Federal para el Distrito de Puerto Rico en casos de esta naturaleza, el cual, en su totalidad, exige lo siguiente:

> In order to establish a prima facie case of discrimination under ECOA, a plaintiff must demonstrate (1) that he is a member of a protected class; (2) that he applied for and was qualified for an extension of credit; (3) that despite his qualifications he was rejected; and (4) that others of similar credit stature were extended credit or were given more favorable treatment than plaintiff. If plaintiff succeeds in establishing a prima facie case, then the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the rejection. (Citas omitidas). De Jesus-Serrano v. Sana Inv. Mortg. Bankers, Inc., 552 F. Supp. 2d 196, 198 (D.P.R. 2007) (citando a Mercado García v. Ponce Fed. Bank, supra).

---

[11]Véase, por ejemplo, Rosa v. Park West Bank & Trust, 214 F.3d 213, 215 (1st Cir.2000) (" In interpreting the ECOA, this court looks to Title VII case law, that is, to federal employment discrimination law".); Bhandari v. First Nat. Bank of Commerce, 808 F.2d 1082, 1100-01 (5th Cir.1987) ("The language is closely related to that of Title VII of the Equal Employment Opportunity Act ("EEOA") and was intended to be interpreted similarly".); Williams v. First Fed. Sav. & Loan Ass'n., 554 F.Supp. 447, 448 (N.D.N.Y.1981), aff'd, 697 F.2d 302 (2d Cir.1982) ("However, the legislative history is very clear that the protections afforded by the ECOA should be applied in the same manner as those created by Title VII Equal Employment Opportunity Commission (EEOC) provisions".); Gross v. Small Business Admin., 669 F.Supp. 50, 52 (N.D.N.Y.1981), aff'd, 867 F.2d 1423 (2d Cir.1988)("The court notes that other courts have generally required proof in ECOA cases to conform to the traditional Title VII tests".).

De nuevo, tanto el ECOA como su Reglamento B desglosan con especificidad los factores que describen las clases o categorías protegidas bajo sus disposiciones: raza; color; religión; origen nacional; sexo o estatus marital; edad cuando el solicitante tiene capacidad para contratar, o si parte del ingreso del solicitante proviene de programas de asistencia pública. En consecuencia, este Tribunal debe establecer con claridad que un reclamo bajo las protecciones del ECOA o su Reglamento B requiere que la persona con el agravio alegado pertenezca a una de las clases protegidas enumeradas previamente. De lo contrario, su reclamo es improcedente.

Como puede notarse con facilidad, ser accionista de una compañía no se encuentra entre las clases protegidas especificadas en el estatuto ni es considerada como una bajo cualquier otra legislación anti-discrimen en nuestro ordenamiento o el federal.[12] Tampoco el señor Krans Negrón ha argumentado ser parte de alguna de estas.[13] Por lo tanto, este

---

[12]Para una discusión similar bajo hechos paralelos, véase de forma persuasiva: First Fidelity Bank v. Best Petroleum, Inc., 757 F. Supp. 293 (S.D.N.Y. 1991).

[13]No está demás señalar que el señor Krans Negrón era, en su calidad personal, el garantizador y no el solicitante de la línea de crédito; es decir, el solicitante era Cable Media. De hecho, existe cierto debate en varios circuitos federales sobre si un garantizador tan siquiera puede realmente considerarse como solicitante para propósitos de las protecciones bajo el ECOA. Si bien la Corte de Apelaciones del Sexto Circuito validó la inclusión del garantizador en la definición de solicitante de conformidad con el Reglamento B en RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC, 754 F.3d 380 (6th Cir. 2014), tan reciente como en el

2019, la Corte de Apelaciones del Undécimo Circuito determinó que los conceptos eran incompatibles por la propia naturaleza de sus respectivos roles en la transacción, por lo que el Reglamento B, una determinación administrativa en su naturaleza, no merecía deferencia en cuanto a esto. ("So, taken together, these definitions suggest that the ordinary meaning of the term "applicant" is one who requests credit to benefit himself. A guarantor does not fit within this definition". Regions Bank v. Legal Outsource PA, 936 F.3d 1184, 1191 (11th Cir. 2019)). Ya desde el 2007, la Corte de Apelaciones del Séptimo Circuito había acogido una postura similar. ("But there is nothing ambiguous about "applicant" and no way to confuse an applicant with a guarantor. What is more, to interpret "applicant" as embracing "guarantor" opens vistas of liability that the Congress that enacted the Act would have been unlikely to accept". Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co., LLC, 476 F.3d 436, 441 (7th Cir. 2007).)

Según lo explica la Corte de Apelaciones del Octavo Circuito en Hawkins v. Cmty. Bank of Raymore, 761 F.3d 937, 941 (8th Cir. 2014):

> Applying the first step of the Chevron framework, we conclude that the text of the ECOA clearly provides that a person does not qualify as an applicant under the statute solely by virtue of executing a guaranty to secure the debt of another. To qualify as an applicant under the ECOA, a person must "appl[y] to a creditor directly for ... credit, or ... indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." To "apply" means "to make an appeal or request esp[ecially] formally and often in writing and usu[ally] for something of benefit to oneself." Thus, the plain language of the ECOA unmistakably provides that a person is an applicant only if she requests credit. But a person does not, by executing a guaranty, request credit. "A 'guaranty' ... [is] a promise to answer for another person's debt, default, or failure to perform. More specifically, a guaranty is an undertaking by a guarantor to answer for payment of some debt, or performance of some contract, of another person in the event of default." A guaranty is collateral and secondary to the underlying loan transaction between the lender and the borrower. While a guarantor no doubt desires for a lender to extend credit to a borrower, it does not follow from the execution of a guaranty that a guarantor has requested credit or otherwise been involved in applying for credit.

ha fallado en demostrar la existencia del primer requisito para un caso prima facie de discrimen bajo el ECOA y, en consecuencia, no tiene un reclamo válido al amparo de tal estatuto.

Con ello establecido, procede entonces el análisis de desestimación, el cual requiere que se tomen como ciertos, y de la manera más favorable para la parte en contra de la desestimación, todos los hechos bien alegados por esta. En particular, la desestimación solicitada bajo el argumento de que no se justifica la concesión de un remedio se dirige a los méritos de la controversia.

Con ello en mente, tomando como cierto que el BPPR exigió la firma en garantía del señor Krans Negrón para la extensión de la línea de crédito a Cable Media, ello no justifica la concesión de un remedio bajo la ECOA. Según se explicó, el acto no fue discriminatorio por razón de que el señor Krans Negrón no pertenece a alguna clase protegida. Por consiguiente, procede en los méritos la desestimación de la Reconvención presentada por el señor Krans Negrón.

**IV**

Por los fundamentos expresados, se revoca la Sentencia del Tribunal de Apelaciones y se reinstala en su totalidad el dictamen del Tribunal de Primera Instancia. En consecuencia, se declara con lugar la Moción de sentencia

---

Thus, a guarantor does not request credit and therefore cannot qualify as an applicant under the unambiguous text of the ECOA. (Citas omitidas).

sumaria presentada por el Banco Popular de Puerto Rico con respecto a la reclamación de cobro de dinero y se desestima la Reconvención del Sr. Kenneth Krans Negrón.

Se dictará Sentencia de conformidad.


                                        Luis F. Estrella Martínez
                                             Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Banco Popular de Puerto Rico<br><br>Peticionario<br><br>v.<br><br><br>Cable Media of Puerto Rico, Inc.; Kenneth S. Krans Negrón<br><br>Recurridos | CC-2023-0684 | Certiorari |

Sentencia

En San Juan, Puerto Rico, a 7 de enero de 2025.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, se revoca la Sentencia del Tribunal de Apelaciones y se reinstala en su totalidad el dictamen del Tribunal de Primera Instancia. En consecuencia, se declara con lugar la Moción de sentencia sumaria presentada por el Banco Popular de Puerto Rico con respecto a la reclamación de cobro de dinero y se desestima la Reconvención del Sr. Kenneth Krans Negrón.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Kolthoff Caraballo concurre sin opinión escrita.


                              Javier O. Sepúlveda Rodríguez
                              Secretario del Tribunal Supremo