Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| ARIEL ACEVEDO PEÑALBERT; ÁNGEL ARGUINZONI MELÉNDEZ<br><br>Apelantes<br><br>v.<br><br>WALMART DE PUERTO RICO, INC.; PUEBLO, INC.<br><br>Apelados | KLAN202500038 | APELACIÓN Procedente del Tribunal de Primera Instancia, Sala<br><br>Caso Núm.: BY2022CV06322<br><br>Sobre: Despido Injustificado |
|---|---|---|

Panel integrado por su presidenta, la Juez Brignoni Mártir, el Juez Candelaria Rosa, la Jueza Álvarez Esnard y la Jueza Díaz Rivera

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 6 de marzo de 2025.

Comparece ante nos el señor Ariel Acevedo Peñalbert ("señor Acevedo") y el señor Ángel Arguinzoni Meléndez ("señor Arguinzoni") (en conjunto, "los Apelantes") mediante *Apelación* recibida el 15 de enero de 2025. Nos solicita que revoquemos la *Sentencia* dictada el 15 de diciembre de 2024 y notificada el 16 de diciembre del mismo año, por el Tribunal de Primera Instancia, Sala Superior de Bayamón ("foro primario" o "foro *a quo*"). Mediante el mencionado dictamen, el foro primario declaró *Ha Lugar* la solicitud de sentencia sumaria presentada por Walmart de Puerto Rico, Inc. ("Walmart"), a la cual se unió Pueblo, Inc. ("Pueblo") y, en consecuencia, desestimó con perjuicio la reclamación de despido injustificado al amparo la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como Ley Sobre Despidos Injustificados, 29 LPRA sec. 185a *et seq.* ("Ley Núm. 80") instada por los Apelantes.

Por los fundamentos que expondremos a continuación, **confirmamos** la *Sentencia* apelada.

**I.**

El 12 de diciembre de 2022, los Apelantes instaron *Querella* sobre despido injustificado por virtud de la Ley Núm. 80 contra Walmart.[1] En esta, alegaron que ambos Apelantes fueron empleados de Supermercados Amigo. Específicamente explicaron que el señor Acevedo trabajaba en dicha entidad desde el 23 de enero de 1984 y para el mes de agosto de 2022 devengaba un sueldo de quince dólares ($15.00) la hora. Asimismo, detallaron que el señor Arguinzoni comenzó a laborar en Supermercados Amigo el 25 de octubre de 1999, y para agosto de 2022 devengaba un sueldo de doce dólares con setenta y cuatro centavos ($12.74) la hora. Indicaron que, en febrero de 2002, Walmart adquirió la cadena de Supermercados Amigo.

Igualmente, de la Querella se desprende que el 31 de agosto de 2022, Walmart les anunció que daba por terminado su contrato de empleo. Como consecuencia de esto, los Apelantes reclamaron que sufrieron un despido injustificado y conforme a las disposiciones de la Ley Núm. 80, Walmart debía indemnizar al señor Acevedo con ochenta y cuatro mil dólares ($84,000.00) y al señor Arguinzoni con cuarenta y seis mil ochocientos ochenta y tres dólares con veinte centavos. ($46,883.20).

Posteriormente, el 3 de mayo de 2023, los Apelantes presentaron *Querella Enmendada*.[2] En esta, incluyeron a Pueblo como parte coquerellada y abundaron sobre el hecho de que el despido de los Apelantes se produjo como parte de un proceso de traspaso de un negocio en marcha en el cual Pueblo adquirió a Supermercados Amigo. Argumentaron que, durante el proceso de

---

[1] Véase, Apéndice de la parte Apelada, págs. 1-3.
[2] Véase, Apéndice de los Apelantes, págs. 50-53.

adquisición, Pueblo optó por no continuar con los servicios de algunos empleados de Supermercados Amigo, entre estos, los Apelantes. Por este motivo, razonaron que Walmart era responsable de indemnizarlos por despido injustificado conforme a la Ley Núm. 80. Además, señalaron que según el Artículo 6 del mencionado estatuto, Pueblo, como adquirente de Supermercados Amigo, tenía la obligación de retener la cantidad correspondiente del precio de venta acordado, suma a la cual los Apelantes tenían derecho.

En respuesta, el 22 de mayo de 2023, Walmart presentó *Contestación a Querella Enmendada.*[3] Mediante esta, negó ciertas alegaciones y levantó sus correspondientes defensas afirmativas. Entre esta, esgrimió que los Apelantes no tenían remedio disponible conforme a la Ley Núm. 80 ya que en el presente caso se configuraba la figura del traspaso de negocio en marcha y los Apelantes rechazaron la oferta de continuar trabajando para Pueblo como patrono adquirente. Por su parte, el 4 de octubre de 2023, Pueblo presentó *Contestación a Querella Emendada.*[4] Mediante la misma, destacó que los Apelantes no aceptaron la oferta de empleo que esta empresa le extendió.

Ulteriormente, el 7 de noviembre de 2023, Walmart presentó *Solicitud de Sentencia Sumaria.*[5] Por virtud de esta, adujo que el foro primario debía desestimar la reclamación incoada por los Apelantes. Sostuvo su contención mediante el fundamento de que la transacción comercial entre Walmart y Pueblo respecto a las operaciones de Supermercados Amigo fue un traspaso de negocio en marcha conforme las disposiciones de la Ley Núm. 80. A su vez, indicó que Pueblo como patrono adquirente, interesaba continuar con los servicios de los Apelantes como empleados de la empresa y

---

[3] *Íd.*, págs. 54-59.
[4] *Íd.*, págs. 60-65.
[5] *Íd.*, págs. 66-82.

les extendió ofertas de empleo. No empece a ello, destacó que los Apelantes rechazaron dichas ofertas. Además, afirmó que, como consecuencia de esta acción, Walmart no era responsable por el pago de indemnización provisto por la Ley Núm. 80 pues el patrono adquirente si estaba interesado en continuar con los servicios que brindaban los Apelantes como empleados. De la misma forma, el 13 de diciembre de 2023, Pueblo presentó *Moción Uniéndonos a Moción de Sentencia Sumaria*,[6] en la cual, esencialmente, se unió al reclamo de Walmart en cuanto a desestimar con perjuicio la *Querella Enmendada*.

Por su lado, el 20 de septiembre de 2024, los Apelantes presentaron *Oposición a Solicitud de Sentencia Sumaria*.[7] Mediante la misma, argumentaron que Pueblo optó por no continuar con los servicios de lo Apelantes. Detallaron que, en el acuerdo de compra entre Walmart y Pueblo, este último se comprometió a realizarle una oferta de empleo a los empleados de Supermercados Amigo en términos sustancialmente similares a los que estos disfrutaban con Walmart. Esbozaron que, no empece a esto, la oferta que Pueblo le hizo a los Apelantes no fue sustancialmente similar, puesto que Pueblo les ofreció a ambos un sueldo de nueve dólares con cincuenta centavos ($9.50) la hora pese a que el sueldo de los Apelantes al momento del traspaso rondaba en quince dólares ($15.00) la hora en cuanto al señor Acevedo y doce dólares con setenta y cuatro ($12.74) centavos en cuanto al señor Arguinzoni.

En ese sentido, los Apelantes abundaron que el término despido era uno amplio conforme lo define la Ley Núm. 80. Agregaron que dicho concepto incluía circunstancias tales como cuando una persona renunciaba por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar como consecuencia de

---

[6] *Íd.*, págs. 166-167.
[7] *Íd.*, págs. 168-193.

circunstancias tales como reducción de salario. Aclararon que el distintivo peculiar de un despido constructivo residía en que el patrono forzaba al empleado a dimitir del trabajo y, por ende, razonaron que la oferta de empleo de nueve dólares con cincuenta centavos ($9.50) por hora, equivalía a un despido constructivo. Así pues, los Apelantes concluyeron que en este caso se encontraban presente los dos (2) requisitos que establece el Artículo 6 de la Ley Núm. 80 para que Walmart tuviera la obligación de pagar la mesada, a saber, a) la ocurrencia de un traspaso de negocio y b) que Pueblo optó por no continuar con los servicios de los Apelantes.

Tras varios incidentes procesales, el 10 de octubre de 2024, Pueblo presentó *Moción de Sentencia Sumaria Suplementaria de Pueblo Inc. y en Oposición al Intento de Enmiendas a las Alegaciones*.[8] En lo pertinente, esta entidad esgrimió que, en su oposición a la moción de sentencia sumaria, los Apelantes pretendían enmendar las alegaciones en esas etapas de los procedimientos. Específicamente, ilustraron que la causa de acción del presente caso se instó expresamente fundamentándose en el Artículo 6 de la Ley Núm. 80 pero los Apelantes introdujeron una nueva teoría legal que giraba en torno al Artículo 5 del aludido estatuto con el argumento del despido constructivo. De esta manera, señaló que dichas enmiendas eran improcedentes ya que estas no tenían el fin de resolver el litigio y que, de permitirse, aun así, no se satisfacían los criterios que el propio Artículo 5 de la Ley Núm. 80 exigía.

Así las cosas, el 15 de diciembre de 2024, el foro primario emitió *Sentencia*,[9] la cual fue notificada el 16 de diciembre del

---

[8] Véase, Apéndice de la parte Apelada, págs. 10-36.
[9] Véase, Apéndice de los Apelantes, págs. 1-49.

mismo año. Mediante esta, el foro *a quo* formuló las siguientes determinaciones de hechos:

1) Walmart es una corporación organizada al amparo de las leyes del Estado Libre Asociado de Puerto Rico que se dedica a la venta de productos a través de sus tiendas ubicadas en varias localidades alrededor de Puerto Rico.

2) Amigo es una cadena de tiendas que se dedica a la venta de alimentos y provisiones en sus tiendas ubicadas en varios puntos del área este de Puerto Rico.

3) Walmart fue patrono de los querellantes durante el periodo en que ésta operaba los Supermercados Amigo— es decir, hasta el 31 de agosto de 2022.

4) Para junio de 2022, el señor Acevedo se desempeñaba como empleado a tiempo completo (full-time) en el puesto de "Produce Stocker" en Supermercados Amigo de Rexville, Bayamón como asociado del programa CAP.

5) El 1 de julio de 2022, Walmart le cursó una carta al señor Acevedo en la que le informó sobre la adquisición de Amigo por parte de Pueblo, así como algunas fechas importantes relacionadas al proceso de transferencia.

6) Debido a que para el 1 de julio de 2022, el señor Acevedo se encontraba de vacaciones, a su regreso, el Sr. José Feliciano (señor Feliciano), Gerente de Supermercados Amigo de Rexville, le entregó la referida carta. El Gerente le explicó al señor Acevedo la situación, le informó algunas fechas importantes y que el señor Acevedo seguiría trabajando sus turnos asignados por Walmart hasta el 31 de agosto de 2022. Además, le adelantó que Pueblo le extendería una oferta de empleo.

**7)** En o alrededor del 8 de julio de 2022, una empleada de Pueblo visitó el Amigo de Rexville, se reunió con el señor Acevedo **y le entregó una carta junto con "una hoja que resume los múltiples beneficios y componentes de conforman la Compensación Total de tu oferta de empleo."**

**8) Pueblo le extendió al señor Acevedo una oferta de empleo para formar parte de Pueblo y continuar trabajando en Amigo.**

**9) El señor Acevedo no aceptó la oferta de empleo que le extendió Pueblo para continuar trabajando en Amigo.**

10) El señor Acevedo continuó trabajando en Walmart hasta el 31 de agosto de 2022, fecha en que cesó su relación de empleo con Walmart.

11) El señor Acevedo tuvo la oportunidad de continuar la relación de empleo con Pueblo, no obstante, decidió rechazar la oferta de empleo que le hizo Pueblo y se negó a participar del proceso de reclutamiento de Pueblo.

12) El señor Acevedo reconocía y entendía que, para el 31 de agosto de 2022, dejaría de ser empleado de Walmart.

13) Una vez advino efectivo el traspaso del negocio (Supermercados Amigo) entre Walmart y Pueblo, a partir del 31 de agosto de 2022, Walmart ya no opera los Supermercados Amigo.

14) El 1 de septiembre de 2022, Walmart llevó a cabo la entrevista de salida con el señor Acevedo.

15) Para junio de 2022, el señor Arguinzoni se desempeñaba como empleado a tiempo completo (full-time) en la posición de asociado al programa CAP, en el supermercado Amigo de Plaza Guaynabo.

16) El 1 de julio de 2022, Walmart le notificó al señor Arguinzoni sobre la adquisición de Amigo por parte de Pueblo, así como de algunas fechas importantes relacionadas al proceso de transferencia.

17) En específico, Walmart le notificó al señor Arguinzoni que se encontraba en el proceso de transferencia de los Supermercados Amigo a Pueblo y que, a partir del 11 de julio de 2022, personal de Pueblo estaría coordinando una reunión para extenderle una oferta de empleo. También se le informó al señor Arguinzoni que podría continuar trabajando los turnos asignados por Walmart hasta el 31 de agosto de 2022.

18) Walmart le informó al señor Arguinzoni que, efectivo el 31 de agosto de 2022, ya Walmart no sería el dueño de las operaciones de los Supermercados Amigo por lo que en ese momento dejaría de ser empleado de Walmart.

19) El 20 de agosto de 2022, el señor Arguinzoni llenó una solicitud de empleo para Pueblo con su información general, educación, disponibilidad para trabajar los turnos, historial de empleo y las diferentes destrezas en las áreas del supermercado.

**20) Ese mismo día, el señor Arguinzoni recibió una oferta de empleo de parte de Pueblo.**

**21) El 20 de agosto de 2022, Pueblo le extendió una oferta de empleo al señor Arguinzoni para el puesto de Grocery Clerk en el Supermercado Amigo de Guaynabo.**

22) El señor Arguinzoni se llevó la oferta de empleo para considerarla.

**23)** No obstante, transcurrido un tiempo, **el señor Arguinzoni no aceptó la oferta de empleo que le hizo Pueblo para que continuara trabajando en Amigo.**

24) El señor Arguinzoni reconoció y entendió que, para el 31 de agosto de 2022, él dejaría de ser empleado de Walmart porque la operación de Amigo ya no sería de Walmart.

25) El señor Arguinzoni continuó trabajando en Walmart hasta el 31 de agosto de 2022, fecha en que cesó su relación de empleo con Walmart.

26) El 31 de agosto de 2022, Walmart llevó a cabo la entrevista de salida con el señor Arguinzoni.

27) Mediante comunicación escrita, Walmart notificó a sus empleados que laboraban en los Supermercados Amigo que, como parte del proceso de transición, Pueblo les extendería ofertas de empleo a la mayoría de los asociados que allí trabajaban.

28) Como parte de las negociaciones comerciales entre Walmart y Pueblo, ésta acordó que le reconocería a los empleados contratados los años de servicio que éstos llevaban trabajando en Supermercados Amigo.

29) Al traspasar a Pueblo, la operación de los Supermercados Amigo retuvo su nombre comercial.

30) Desde el 31 de agosto de 2022, Walmart ya no opera las tiendas Supermercados Amigo.

31) El señor Acevedo comenzó a trabajar para Supermercados Amigo en el mes de enero de 1984.

32) El señor Arguinzoni comenzó a trabajar para Supermercados Amigo en el mes de octubre de 1999.

33) Walmart adquirió los Supermercados Amigo en el año 2003.

34) Walmart le concedió al señor Acevedo los siguientes aumentos de sueldo.

   a) 25 de enero de 2005 - $8.60 la hora.

   b) 28 de diciembre de 2005 - $8.35 la hora.

   c) 20 de diciembre de 2006 - $9.31 la hora.

   d) 31 de diciembre de 2007 - $9.91 la hora.

   e) 23 de julio de 2008 - $10.10 la hora.

   f) 31 de diciembre de 2008 - $10.35 la hora.

   g) 19 de diciembre de 2009 - $10.60 la hora.

   h) 28 de diciembre de 2010 - $10.85 la hora.

   i) 26 de diciembre de 2011 - $11.10 la hora.

   j) 26 de diciembre de 2012 - $11.35 la hora.

   k) 26 de diciembre de 2013 - $11.60 la hora.

   l) 31 de diciembre de 2014 - $11.85 la hora.

   m) 20 de enero de 2016 - $12.18 la hora.

   n) 31 de enero de 2020 - $14.49 la hora.

35) Para el 1 de enero de 2022, el señor Acevedo devengaba un sueldo de $14.75 la hora.

36) Para el 31 de agosto de 2022, al momento de terminar la relación de empleo con Walmart, el salario del señor Acevedo era de $15.00 la hora.

37) Walmart le concedió a Ángel Y. Arguinzoni Meléndez los siguientes aumentos de sueldo.

   a) 8 de enero de 2005 - $6.69 la hora.

   b) 25 de agosto de 2005 - $6.96 la hora.

   c) 23 de abril de 2007 - $7.24 la hora.

   d) 25 de septiembre de 2007 - $7.74 la hora.

   e) 23 de julio de 2008 - $7.99 la hora.

   f) 26 de septiembre de 2008 - $8.24 la hora.

   g) 24 de agosto de 2009 - $8.49 la hora.

   h) 6 de abril de 2011 - $8.74 la hora.

   i) 24 de septiembre de 2011 - $9.24 la hora.

   j) 10 de marzo de 2012 - $9.74 la hora.

   k) 12 de noviembre de 2013 - $10.24 la hora.

   l) 20 de septiembre de 2014 - $10.49 la hora.

   m) 26 de septiembre de 2015 - $10.99 la hora.

   n) 19 de septiembre de 2016 - $11.24 la hora.

   o) 15 de octubre de 2018 - $11.74 la hora.

   p) 27 de septiembre de 2019 - $12.24 la hora.

38) Para el 31 de agosto de 2022, al momento de terminar la relación de empleo con Walmart, el salario del señor Arguinzoni Meléndez era de $12.74 la hora.

39) El 10 de junio de 2022, Walmart acordó vender las tiendas Supermercados Amigo, en las cuales trabajaban los querellantes, a la coquerellada Pueblo, mediante un documento titulado Asset Purchase Agreement o APA. Para esta fecha, Walmart administraba Amigo, las tiendas Walmart y las tiendas Sam's Club.

40) En el APA, Walmart y Pueblo acordaron que, a los empleados de Amigo, Pueblo le haría una oferta de empleo, en unos términos substancialmente similares a los que disfrutaban con Walmart.

41) Además, en el APA, Walmart y Pueblo acordaron que a los empleados definidos como "regular hourly employees", entre los que se encontraban los querellantes, Pueblo les haría una oferta de empleo por un sueldo por hora, de al menos $9.50 por hora. A diferencia de los coquerellantes, Walmart y Pueblo acordaron que a los empleados de Amigo, definidos como "managers" o "specialty employees", Pueblo le haría una oferta de empleo, por un sueldo por hora igual o mayor que el que disfrutaban con Walmart.

42) En específico, Walmart y Pueblo acordaron lo siguiente:

ARTICLE 6
EMPLOYEE MATTERS

Section 6.1 Employees. (a) Buyer hereby agrees to offer employment, effective as of the Closing Date, to all of Seller's Store-based Employees employed at the Acquired Stores on the Closing Date (except as set forth below), on terms that are substantially similar to those enjoyed by Buyer's employees, including life insurance for all employees and medical plan and savings plan for employees classified by Buyer as fulltime employees; provided, however, that (i) in the case of Managers and Specialty Employees (as defined in Section 6.11(c)), Buyer's offer shall be at least at the same hourly rate or salary earned by such employees prior to the Closing Date (but without giving effect to any wage or salary increases that were granted other than in the ordinary course of business, or in contemplation of the transactions set forth in this agreement); and (ii) in the case of Regular Hourly Employees (as defined in Section 6.1(c)), Buyer shall offer them an hourly wage of at least $9.50 per hour.

43) En una carta con fecha de 1 de julio de 2022, Walmart notificó a los querellantes que, habían llegado a un acuerdo de adquisición, mediante el cual se transferirían las operaciones de Amigo a Pueblo. En dicha carta Walmart les comunicó a los querellantes que la terminación de empleo con Walmart era permanente, y que estos no tendrían preferencia de retención o preferencia de empleo. Además, Walmart les comunicó a los demandantes que personal de Pueblo estaría pautando reuniones en su unidad para extenderle ofertas de empleo a la mayoría de los asociados.

44) En la carta de 1 de julio de 2022, Walmart les comunicó a los demandantes que no podrían optar por posiciones vacantes con Walmart, es decir, que estos no podían solicitar las posiciones disponibles en las tiendas Walmart, administradas por el coquerellado. La prohibición de optar por posiciones vacantes en las

tiendas Walmart se extendía por el término de un (1) año a partir del 31 de agosto de 2022.

45) Con posterioridad a recibir la carta de 1 de julio de 2022, empleados de Pueblo acudieron a la tienda Supermercados Amigo de Rexville, Bayamón, y comenzaron a reunirse con los compañeros de trabajo del señor Acevedo.

46) Luego de hablar con varios de sus compañeros de trabajo, los cuales ya habían sido entrevistados por los empleados de Pueblo, el señor Acevedo se enteró de que, a todos los que ocupaban el mismo puesto de trabajo que él ocupaba, les habían hecho una oferta de empleo por un sueldo de $9.50 la hora.

47) El Sr. José Feliciano, Gerente de la tienda de Rexville, Bayamón, se acercó al señor Acevedo, para invitarlo a reunirse con los empleados de Pueblo, sin embargo, este le expresó que no estaba dispuesto a trabajar con Pueblo por un sueldo de $9.50 la hora. Ante esto, declinó reunirse con los empleados de Pueblo.

48) Al igual que sucedió con el señor Acevedo, con posterioridad a recibir la carta de 1 de julio de 2022, empleados de Pueblo acudieron a la tienda Supermercados Amigo de Guaynabo, y comenzaron a reunirse con los compañeros de trabajo del señor Arguinzoni. Pueblo se reunió con el señor Arguinzoni y le hizo una oferta de empleo a por un sueldo de $9.50 por hora.

49) Un total de 71 empleados de Supermercados Amigo rechazaron la oferta de empleo de Pueblo, y esta le notificó un documento a Walmart en el cual le informaron cuales fueron dichos empleados.

50) En una carta con fecha de 31 de agosto de 2022, firmada por la Sra. Rosana Meléndez Colón, Walmart informó a los querellantes, que daba por terminados sus contratos de empleo con Walmart.

51) Entre los asuntos para los cuales Walmart solicitaba relevo, mediante el Acuerdo de Indemnización por Terminación de Empleo con Walmart y Relevo, estaba, toda reclamación por "despido injustificado" bajo la Ley Num.80 del 30 de mayo de 1976, según enmendada, 29 LPRA §185(a) y subsiguientes, incluyendo las disposiciones de re-empleo (recall) por antigüedad, de despido tácito o constructivo y de traspaso de negocio en marcha.

52) Para el 31 de agosto de 2022, al momento de terminar la relación de empleo con Walmart, el señor Acevedo tenía 59 años de edad, y 38 años de servicio en los Supermercados Amigo.

53) Para el 31 de agosto de 2022, al momento de terminar la relación de empleo con Walmart, el señor Arguinzoni tenía 48 años de edad, y 22 años de servicio en los Supermercados Amigo.

54) La compraventa de los Supermercados Amigo por parte de Walmart constituyó un traspaso de negocio en marcha.

55) En el año 2022, Walmart y Pueblo negociaron la compraventa de ciertos activos de varios establecimientos Amigo, incluyendo aquellos en donde trabajaban ambos querellantes.

56) El proceso de Pueblo para reclutar empleados para los establecimientos Amigo estuvo compuesto de dos (2)

fases: a) Fase 1 - entrega de solicitudes de empleo a los empleados de Walmart; y Fase 2 – se le hacía una oferta de empleo por parte del personal de Pueblo a quienes completaran la solicitud.

57) Como parte del proceso de oferta, los candidatos recibían una oferta con "Compensación Total" de parte de Pueblo, concepto que comprendía:

    a. salario o compensación por hora;

    b. seguro médico, que no es mandatorio por ley;

    c. seguro de vida, gratuito para todo el personal;

    d. plan de ahorro o plan de retiro 401k;

    e. incentivos de turnos nocturnos 9pm-5am ($1.00 adicional a la tarifa

    i. "rate" regular);

    f. 15 días de licencia de vacaciones;

    g. 12 días de licencia de enfermedad;

    h. 3 días de licencia funeral;

    i. bono de Navidad, computado a base de 700 horas de trabajo;

    j. un pavo en Acción de Gracias – pavo;

    k. descuentos de alimentos (desayuno y almuerzo);

    l. Cena familiar en el día de Madres o Padres;

    m. un bono de retención en el reclutamiento;

    n. entre otros.

58) El concepto de Compensación Total, según identificado en la carta del 8 de julio de 2022, comprendía una oferta que contemplaba el salario por hora, sumado a todos los beneficios que Pueblo invertiría en los empleados.

59) El señor Acevedo nunca se comunicó con Pueblo a los fines de explorar un cambio en las ofertas que se estaban extendiendo al personal. Solo no completó el proceso.

60) El señor Arguinzoni nunca se comunicó con Pueblo a los fines de explorar un cambio en la oferta extendida.[10]

Cónsono con estas determinaciones de hechos, el foro primario determinó que, en efecto, Pueblo les extendió a los apelantes una oferta de empleo para formar parte la empresa y continuar laborando Supermercados Amigo. Concluyó que dicha oferta, además del salario, contenía otros beneficios para los empleados. Dictaminó que ambos Apelantes rechazaron las aludidas ofertas por lo cual, al haber un interés de Pueblo, como patrono adquirente, de continuar con los servicios de los Apelantes y estos no aceptar la oferta de empleo, Walmart como patrono

---

[10] *Íd.*, págs. 12-21.

anterior no era responsable del pago de mesada como parte de la figura de traspaso de un negocio en marcha. Asimismo, resolvió que, ya que los Apelantes no aceptaron voluntariamente la oferta de empleo de Pueblo, estos nunca fueron empleados del patrono adquirente por lo cual, Pueblo tampoco era responsable de pagar indemnización alguna. Por consiguiente, el foro *a quo* adjudicó que, en el caso de marras, no ocurrió un despido injustificado y consecuentemente procedió a desestimar la querella incoada con perjuicio.

Inconforme con el resultado, el 16 de enero de 2025, los Apelantes comparecieron ante esta Curia mediante el recurso de epígrafe y formularon el siguiente señalamiento de error:

> Erró el Honorable Tribunal de Primera Instancia al interpretar el Artículo 6 de la Ley Núm. 80-1976 y concluir que las ofertas de empleo realizadas a los demandantes, cuyo sueldo no era similar al que devengaban estos, eximieron a Walmart de pagar la mesada.

El 22 de enero de 2025, emitimos *Resolución* en la que le concedimos un término de treinta (30) días a la parte Apelada para que expusiera su posición en torno al recurso. Oportunamente, el 24 de enero de 2025, Pueblo presentó *Alegato en Oposición de la parte Apelada.* En esta reiteró que no había fundamento alguno para revocar el dictamen apelado toda vez que la solicitud de sentencia sumaria estuvo sustentada con prueba documental admisible que demostró que el despido de los Apelantes fue uno justificado. Por su parte, el 24 de febrero de 2025, Walmart compareció mediante *Alegato de la parte Apelada,* en la cual sostuvo que el foro primario no erró al conceder la solicitud de sentencia sumaria, la cual desestimó la causa de acción de los Apelados.

Con el beneficio de la comparecencia de todas las partes, procedemos a exponer la normativa jurídica aplicable al caso de autos.

## II.

### A. *Sentencia Sumaria*

La sentencia sumaria es un mecanismo procesal cuyo propósito principal es facilitar la solución justa, rápida y económica de los litigios que no presentan controversias genuinas de hechos materiales y, por lo tanto, no ameritan la celebración de un juicio a fondo. *Birriel Colón v. Econo y otros,* 213 DPR ___ (2023), 2023 TSPR 120, pág. 9; Véase, además, *Segarra Rivera v. Int'l Shipping et al.,* 208 DPR 964, 979 (2022). La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R.36, permite que, en un litigio, cualquiera de las partes le solicite al tribunal que se dicte sentencia sumaria a su favor, ya sea sobre la totalidad o cualquier parte de la reclamación solicitada. Reglas 36.1 y 36.2 de Procedimiento Civil, *supra.* No obstante, para que una sentencia sumaria proceda, es necesario que de los documentos que la acompañan, surja de manera preponderante la inexistencia de controversia sobre los hechos medulares del caso. *Jiménez Soto v. Carolina Catering Corp.,* 215 DPR ___ (2025), 2025 TSPR 3, pág. 10.

Para poder demostrar eficientemente la falta de controversia sobre hechos esenciales, el promovente de la sentencia sumaria debe: (1) exponer las alegaciones de las partes; y (2) desglosar en párrafos debidamente enumerados los hechos sobre los cuáles, a su entender, no hay controversia. Regla 36.3 de Procedimiento Civil, *supra,* R. 36.3.

En *Meléndez González et al. V. M. Cuebas,* 193 DPR 100 (2015), el Tribunal Supremo estableció "el estándar específico" que debe utilizar este Foro al "revisar denegatorias o concesiones de

Mociones de Sentencia Sumaria". A esos efectos, el Tribunal dispuso que:

> el Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679 (2018).

Es decir, planteada una revisión de sentencia sumaria, el Tribunal de Apelaciones está en la misma posición que el Tribunal de Primera Instancia para resolver, por lo que debe evaluar las mociones presentadas en el foro primario y cumplir con los requisitos dispuestos en la Regla 36 de Procedimiento Civil, *supra,* al emitir su dictamen. *Meléndez González et al. v. M. Cuebas, supra.* "[L]a revisión del foro apelativo conlleva examinar *de novo* el expediente de la manera más favorable hacia la parte que se opuso a la solicitud de sentencia sumaria en el tribunal de instancia y realizando todas las inferencias permisibles a su favor". *Birriel Colón v. Econo y otros, supra,* pág. 11, citando a *Meléndez González et al. v. M. Cuebas, supra.*

En tal sentido, como parte de nuestra función revisora, es nuestro deber evaluar todos los documentos que obren en el expediente de manera tal que, previo a determinar la procedencia de una solicitud de sentencia sumaria, se deba realizar un balance adecuado entre el derecho de todo litigante a tener su día en corte y la disposición justa, rápida y económica de los litigios civiles. *Banco Popular de Puerto Rico v. Cable Media of Puerto Rico, Inc.*, 215 DPR___ (2025) 2025 TSPR 1, pág. 9 (citas omitidas). Cónsono con lo anterior, en el ejercicio de nuestra función revisora, estamos

limitados a: (1) considerar los documentos que se presentaron ante el foro primario; (2) determinar si existe o no controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se aplicó correctamente. *Cruz, López v. Casa Bella y otros*, 213 DPR ___ (2024), 2024 TSPR 47, pág. 14.

Por otra parte, nuestra más Alta Curia ha definido el concepto hecho material de la siguiente forma: "[u]n hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Jiménez Soto v. Carolina Catering Corp., supra,* pág. 11. Por ende, la parte promovente tiene el deber de exponer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material. *Íd.*

## B. *Ley Sobre Despidos Injustificados*

La *Ley de Indemnización por Despido sin Justa Causa*, Ley Núm. 80 de 30 de mayo de 1976, según enmendada, ("Ley Núm. 80"), tiene como propósito proteger el derecho de los trabajadores ante las acciones arbitrarias y caprichosas de los patronos. *Segarra Rivera v. Int'l. Shipping et al.,* 208 DPR 964, 982-983 (2022). Por su carácter reparador, esta Ley debe ser interpretada de manera liberalmente a favor de los derechos del trabajador. *Ruiz Mattei v. Commercial Equipment,* 214 DPR___ (2024), 2024 TSPR 68, pág. 13. El referido estatuto le impone el pago de indemnización, conocida como la mesada, a todo patrono que despida sin justa causa a un empleado. 29 LPRA sec. 185a. Para recibir dicha compensación, el empleado despedido debe cumplir con los siguientes requisitos: (1) ser un empleado contratado por tiempo indeterminado; (2) recibir una remuneración; y (3) ser despedido de su puesto sin justa causa. *SLG Torres-Matundan v. Centro Patología,* 193 DPR 920, 929 (2015).

El despido del empleado ocurre cuando el patrono, de forma unilateral, rompe el contrato que celebró con el empleado. *Díaz* v. *Wyndham Hotel Corp.*, 155 DPR 364, 374 (2001). Ahora bien, no todo despido conlleva una reclamación por despido injustificado. A tales efectos, el Art. 2 de la Ley Núm. 80, *supra,* define "justa causa" para un despido como "[a]quella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono". 29 LPRA sec. 185b. También, se considerarán justa causa para el despido "[a]quellas razones que afecten el buen y normal funcionamiento de un establecimiento [...]". *Íd.* A su vez, el Art. 2 de la precitada Ley establece ciertas circunstancias o actos que afectan el buen y normal funcionamiento de un establecimiento, sin que se entienda como una lista taxativa de circunstancias, a saber:

(a) Que el empleado incurra en un patrón de conducta impropia o desordenada.

(b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.

(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.

(d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.

(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento. *Íd.*

Las primeras tres circunstancias son conductas específicamente concernientes al comportamiento del empleado, mientras que el resto responden al cierre, reorganización o reducción de la empresa. *Segarra Rivera v. Int'l. Shipping et al., supra,* pág. 984. Con relación a esto, la Ley Núm. 80, *supra,* dispone que "[n]o se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento". 29 LPRA sec. 185b; Véase, además, *León Torres* v. *Rivera Lebrón,* 204 DPR 20, 51 (2020).

Finalmente, es preciso destacar que la Ley Núm. 80, *supra,* contiene un esquema probatorio mediante en el cual, una vez el empleado despedido demuestra que cumple con los requisitos para ejercer la causa de acción, será el patrono quien tendrá el peso de la prueba para establecer que el despido fue justificado. *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 774-775 (2022).

### C. Traspaso de negocio en marcha

El traspaso de negocio en marcha se define como "aquel que se mantiene operando de forma continua y con la expectativa de seguir funcionando indefinidamente" *Segarra Rivera v. Int'l. Shipping et al., supra,* pág. 992 citando a *Adventist Health v. Mercado,* 171 DPR 255, 266 (2007) Así pues, el Artículo 14 (i) a la Ley Núm. 80, *supra,* define expresamente el traspaso de un negocio en marcha, el cual, en lo pertinente, se establece como:

> [A]quella compraventa de una empresa o negocio, mediante la cual un patrono vende a otro patrono una parte sustancial de los activos y/o pasivos del negocio, sin interrupción o cese en las operaciones del mismo por más de seis (6) meses y se continúa operando el mismo tipo de negocio en el mismo establecimiento, o en uno distinto, con básicamente el mismo equipo, maquinaria e inventario, produciendo básicamente los mismos productos y/o prestando los mismos servicios, reteniendo el mismo nombre del negocio y marcas comerciales o un nombre similar, siempre y cuando la mayoría de los empleados que laboran en el negocio en cualquier momento durante los seis (6) meses siguientes al traspaso trabajaban para el

patrono vendedor al ocurrir el traspaso del negocio. 29 LPRA sec. 185n.

Dicho Artículo se incluyó con el propósito de aclarar la verdadera intención respecto al significado del traspaso de un negocio en marcha: la compraventa. Por otro lado, conforme a las *Guías para la Interpretación de la Legislación Laboral de Puerto Rico*, Departamento del Trabajo y Recursos Humanos, 8 de mayo de 2019, pág. 146, el traspaso de negocio en marcha establece "un esquema de dos pasos: (1) se tiene que determinar si hubo un traspaso de un negocio en marcha y (2) se requiere determinar cuál dueño de negocio o patrono responde por la mesada que corresponde a los empleados."

De otra parte, la Ley Núm. 80 contempla la figura del traspaso de un negocio en marcha de la siguiente manera:

> En el caso del traspaso de un negocio en marcha, si el nuevo adquirente continúa utilizando los servicios de los empleados que estaban trabajando con el anterior dueño, se les acreditará a éstos el tiempo que lleven trabajando en el negocio bajo anteriores dueños. En caso de que el nuevo adquirente opte por no continuar con los servicios de todos o algunos de los empleados y no advenga en su consecuencia patrono de éstos el anterior patrono responderá por la indemnización provista por esta ley el comprador deberá retener la cantidad correspondiente del precio de venta convenido respecto al negocio. En caso de que los despida sin justa causa después del traspaso, el nuevo dueño responderá por cualquier beneficio que bajo esta ley pueda tener el empleado que quede cesante, estableciéndose además un gravamen sobre el negocio vendido para responder del monto de la reclamación. 29 LPRA sec. 185f.

Del texto del aludido texto surge que se proveen dos (2) instancias, en las cuales la decisión sobre continuar o no utilizando los servicios de los empleados del patrono predecesor recae sobre el nuevo adquirente. *Piñeiro v. Int'l Air Serv. of P.R., Inc.*, 140 DPR 343, 349 (1996). De la misma forma, los efectos del citado Artículo 6 de la Ley Núm. 80, no aplica antes del traspaso del negocio en marcha. *Segarra Rivera v. Int'l. Shipping et al., supra,* pág. 994.

**III.**

En el presente recurso, los Apelantes nos solicitan que revoquemos la *Sentencia* dictada sumariamente por el foro primario notificada el 16 de diciembre de 2024. Argumentan, como su único señalamiento de error, que el foro *a quo* incidió en haber desestimado por la vía sumaria la *Querella Enmendada* por despido injustificado que estos instaron contra Walmart y Pueblo Por su parte, tanto Pueblo como Walmart sostienen que la reclamación de los Apelantes fundamentada en el Artículo 6 de la Ley Núm. 80 no logró sustentarse.

Toda vez que el recurso de epígrafe versa sobre la revisión de un dictamen resuelto por la vía sumaria, le corresponde a este foro revisor realizar un examen *de novo,* tanto de la solicitud de sentencia sumaria y sus anejos, así como su oposición. Efectuado el análisis correspondiente, resolvemos que ambas partes cumplieron esencialmente con los requisitos dispuestos en la Regla 36 de Procedimiento Civil, *supra.*

Atendido lo anterior, nos corresponde determinar si existen hechos materiales en controversia y, de haberlos, exponer concretamente cuáles son. De igual forma, se esbozarán los hechos que estén incontrovertidos. Véase, *Roldán Flores v. M. Cuebas et al.*, *supra.* Tras realizar un análisis minucioso del expediente del caso, los documentos y las deposiciones anejadas en la solicitud de sentencia sumaria, así como los de la oposición, **no encontramos la existencia de hechos materiales en controversia**. Cónsono con lo anterior, **adoptamos las determinaciones de hechos formuladas por el foro primario como hechos materiales incontrovertidos**.

Resuelto lo anterior, corresponde entonces revisar *de novo* si el foro primario aplicó correctamente el derecho a la controversia que nos ocupa. De esta manera, procedemos a discutir si conforme

a la Ley Núm. 80 le corresponde Walmart o a Pueblo indemnizar a los Apelantes por despido injustificado. De entrada, es menester destacar que la *Querella Enmendada* se fundamenta específicamente en lo dispuesto por el Artículo 6 de la Ley Núm. 80, por lo cual es por virtud de dicha disposición en la que ejerceremos nuestra función revisora. Es importante hacer esta aclaración, toda vez que el foro primario correctamente resolvió que, en la oposición a la solicitud de sentencia sumaria interpuesta por los Apelantes, se intentó enmendar las alegaciones mediante un argumento de despido constructivo por virtud del Artículo 5 de la Ley Núm. 80. Coincidimos con el foro primario en cuanto a que esta propuesta de enmienda se hizo a destiempo y no siguió los lineamientos establecidos por la Regla 13.1 de Procedimiento Civil 32 LPRA Ap. V, R. 13.1.[11]

Aclarado lo anterior, procedemos a resolver. Como mencionáramos, la contención de los Apelantes gira en torno a un despido injustificado en el contexto de un traspaso de negocio en marcha. Es un hecho incontrovertido que Walmart y Pueblo negociaron la adquisición de la cadena de Supermercados Amigo mediante un documento intitulado *Asset Purchase Agreement* ("APA").[12] En ese sentido, no existe dudas de que en el caso de marras se configuró un traspaso de un negocio en marcha. De esta

---

[11] El texto de la aludida regla establece que:

> Cualquier parte podrá enmendar sus alegaciones en cualquier momento antes de habérsele notificado una alegación responsiva. Si su alegación es de las que no admiten alegación responsiva y el pleito no ha sido señalado para juicio, podrá de igual modo enmendarla en cualquier fecha dentro de los veinte (20) días de haber notificado su alegación. En cualquier otro caso, las partes podrán enmendar su alegación únicamente con el permiso del tribunal o mediante el consentimiento por escrito de la parte contraria; el permiso se concederá liberalmente cuando la justicia así lo requiera. La solicitud de autorización para enmendar las alegaciones deberá estar acompañada de la alegación enmendada en su totalidad.

[12] Véase las determinaciones de hechos 39-41 contenidas en la Sentencia apelada, Apéndice de los Apelantes, pág. 17.

forma, resta por determinar cuál dueño de negocio o patrono sería responsable por la mesada solicitada por los Apelantes.

Conforme surge de expediente, el patrono adquirente, entiéndase Pueblo, le extendió una oferta de empleo a todos los empleados que trabajaban en Supermercados Amigo durante el proceso de traspaso.[13] De hecho, el convenio entre Walmart y Pueblo así lo exigía.[14] Ahora bien, se desprende de los autos que el señor Acevedo fue debidamente notificado sobre el asunto referente a que Pueblo había adquirido a Supermercados Amigo y que seguiría siendo empleado de Walmart hasta el 31 de agosto de 2022.[15] Asimismo, surge que Pueblo le hizo una oferta formal de empleo y el señor Acevedo **consciente de las consecuencia de su decisión, voluntariamente la rechazó ya que no estaba de acuerdo con el sueldo propuesto**. Específicamente, en cuanto a ese asunto, en una deposición que se le tomó al señor Acevedo el 21 de abril de 2023, este aseveró lo siguiente:

> P. Exacto. A menos que usted aceptara la oferta de Pueblo Supermarket, iba a quedar separado de su empleo con Walmart. Usted sabía eso.
>
> R Bueno, en parte yo entendía, pero vuelvo y le digo, yo trabajo con una compañía a $15.00 y de la noche a la mañana o de un día para otro, 9.50. Yo tengo mi casa, mi familia depende de mi salario. ¿Qué uno va hacer?
>
> P Le hago la pregunta de nuevo, don Ariel. Usted sabía que si usted no aceptaba la oferta de Pueblo Supermarket... y yo entiendo que me está diciendo que usted decidió... no la aceptó porque no era... la oferta que le estaban haciendo no era... usted entendía no era comparable a lo que usted se estaba ganando, ¿correcto?
>
> R Es correcto.
>
> P Pero usted reconoce que independientemente usted iba a dejar de ser empleado de Walmart...
>
> R De Walmart.
>
> P ...el 31 de agosto.
>
> R Eso yo lo entendía.

---

[13] Véase el testimonio vertido por el señor Nelson Vélez, vicepresidente de Recursos Humanos de Pueblo, Apéndice de la parte Apelado, pág. 75-78.

[14] Véase determinación de hechos número 42 de la *Sentencia* apelada en la cual se transcribe el artículo 6 de la APA suscrita entre Walmart y Pueblo, Apéndice de los Apelantes, pág. 17.

[15] *Íd.*, págs. 119-120.

> P Okey. Y que para continuar empleado con Pueblo Supermarket tenía, pues, que aceptar la oferta que ellos le hicieran...
>
> R Unjú.
>
> P ...¿correcto?
>
> R Bueno, si quería seguir trabajando, tenía que aceptarla.
>
> P Okey. Y su queja, para yo ponerlo así en este caso, es que la oferta que le hizo Pueblo no era adecuada.
>
> R No es la adecuada.
>
> P ¿Pero esa oferta se la hace Pueblo?
>
> R Pueblo. Por treinta y... Para un empleado de 38 años de servicio, entiendo yo que no es viable, como podríamos decir, la oferta...
>
> P A usted sí...
>
> R ... porque...
>
> P ...le iban a...
>
> R ...mi entusiasmo era seguir trabajando. Yo, pues...
>
> P Entiendo.[16]

Igual conducta asumió el señor Arguinzoni. A este último, también le fue notificado la adquisición de Supermercados Amigo por parte de Pueblo.[17] De igual forma, Pueblo le hizo una oferta de empleo y el señor Arguinzoni la rechazó, tal y como quedó plasmado mediante su propia declaración en la deposición que le tomaron el 21 de abril de 2023, de la cual destacamos este extracto:

> P... escuche mi pregunta. La pregunta es bien sencilla. ¿En algún momento usted le informó a Pueblo Supermarket que aceptaba la oferta de empleo por 9.50 la hora?
>
> R Yo no le... No
>
> P No. ¿Qué usted pensaba iba a pasar con su empleo cuando legara agosto 31 del 2022?
>
> R ¿Agosto 31?
>
> P Unjú. Que era el último día que usted iba a ser empleado de Walmart. Porque eso se lo habían dicho, ¿verdad que sí?, que le habían dicho que usted iba a ser empleado de Walmart hasta agosto 31 del 2022. ¿Verdad que sí?
>
> R Habían dicho, si, que hasta el 31 de agosto...
>
> P Hasta el 31 de agosto.
>
> R ...nosotros éramos empleados de Walmart.
>
> P Y después de eso pasaría a ser empleado de Pueblo Supermarket, si aceptaba la oferta.
>
> R Si aceptaba la oferta.
>
> P Usted no aceptó la oferta ¿correcto?

---

[16] *Íd.*, pág. 127, línea 7 - pág.128, línea 21.
[17] *Íd.*, pág. 139 línea 23 - pág.141 línea 19.

R No, no acepté la oferta de 9.50.[18]

Ahora bien, es menester destacar que el Artículo 6 de la Ley Núm. 80 es diáfana en cuanto a cuál es el patrono que responde en caso de un traspaso de negocio en marcha:

> "[e]n caso de que el nuevo adquirente **opte por no continuar con los servicios de todos o algunos de los empleados** y no advenga en su consecuencia patrono de éstos el anterior patrono responderá por la indemnización provista por esta ley el comprador deberá retener la cantidad correspondiente del precio de venta convenido respecto al negocio" (Énfasis nuestro).

Por otro lado, si se materializa un despido sin justa causa después del traspaso "el nuevo dueño responderá por cualquier beneficio que bajo esta ley pueda tener el empleado que quede cesante..." Véase, Artículo 6 de la Ley Núm. 80.

Nótese que, a tono con este esquema, en el caso de marras, Pueblo **optó por continuar con el servicio de todos los empleados de Supermercados Amigo.** Ante este hecho, forzosamente se debe concluir que Walmart no responde por indemnización alguna toda vez que se materializó un traspaso de negocio en marcha en el cual el patrono adquirente demostró interés en contar con los servicios que estaban brindado los empleados en el supermercado, asunto que quedó evidenciado con la extensión de una oferta de empleo.

Por otra parte, es necesario subrayar que ambos Apelantes rechazaron la oferta de empleo que le ofreció Pueblo. Por consiguiente, Pueblo nunca fue su patrono y no se configuró propiamente el traspaso de los Apelantes a esta empresa. En tal sentido, dado a que los Apelantes y Pueblo no tuvieron relación contractual alguna, ni el señor Acevedo ni el señor Arguinzoni podían reclamarle a Pueblo el pago de mesada conforme a la Ley Núm. 80. En ese sentido, tras un análisis de la prueba que obra en el expediente, la cual incluye documentos, declaraciones juradas y

---

[18] *Íd.*, pág. 153, línea 24 - pág. 154 línea 21.

deposiciones, es forzoso concluir que los Apelantes no lograron demostrar que se configuraron las circunstancias exigidas en el Artículo 6 de la Ley Núm. 80, por lo cual su causa de acción no procedía. Por consiguiente, no se cometió el error que se le imputa al foro primario debido a que, en efecto, correspondía desestimar la querella que originó esta controversia.

**IV.**

Por los fundamentos antes expuestos, **confirmamos** el dictamen apelado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones