ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| | | |
|---|---|---|
| **FIRSTBANK PUERTO RICO**<br><br>Peticionario<br><br>v.<br><br>**RENÉ ADALBERTO PADILLA MAIZ t/c/c RENÉ ALBERTO PADILLA MAIZ; LOURDES ENIT DE JESÚS MORALES y la sociedad legal de gananciales compuesta por ambos**<br><br>Recurrido | KLCE202500293 | ***CERTIORARI***<br>procedente del Tribunal de Primera Instancia, Sala Superior de **San Juan**<br><br>Civil Núm.: **SJ2018CV09048**<br><br>Sobre: Cobro de Dinero; Ejecución de Hipoteca |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Juez Barresi Ramos.

Cintrón Cintrón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de mayo de 2025.

Comparece ante este Foro, First Bank Puerto Rico (First Bank o parte peticionaria) y solicita que revoquemos la *Resolución* notificada el 11 de julio de 2024, por el Tribunal de Primera Instancia (TPI), Sala Superior de San Juan. Mediante la misma, el foro primario declaró *No Ha Lugar* la solicitud de sentencia sumaria instada por la parte peticionaria.

Por los fundamentos que expondremos a continuación, se expide el auto de *certiorari* y se revoca el pronunciamiento impugnado.

**I.**

Según surge del expediente, el 19 de octubre de 2018, First Bank incoó una demanda sobre cobro de dinero y ejecución de

_____

[1] Véase *Orden Administrativa DJ 2024-062C* de 6 de mayo de 2025, sobre enmienda a la orden de designación de Paneles en el Tribunal de Apelaciones.

hipoteca en contra del señor René Adalberto Padilla Maiz t/c/c René Alberto Padilla Maiz, la señora Lourdes Enit De Jesús Morales y la Sociedad Legal de Gananciales compuesta por ambos (en conjunto, matrimonio Padilla-De Jesús o parte recurrida). Alegó que éstos incumplieron con los términos y condiciones de un pagaré hipotecario y de la hipoteca que lo garantiza, al dejar de pagar las mensualidades de un préstamo otorgado por el banco. Añadió que las mensualidades se encontraban vencidas desde el 1 de febrero de 2018 hasta la fecha de la presentación de la demanda. Precisó que la deuda, garantizada por una hipoteca voluntaria sobre un inmueble objeto de la presente controversia localizado en la Urbanización Laderas de San Juan, estaba vencida, líquida y exigible. Arguyó que aceleró la deuda conforme permitía el contrato de hipoteca. En suma, requirió al TPI que declarara ha lugar la demanda y condenara al matrimonio Padilla-De Jesús al pago de $320,605.92, más intereses a razón del 4.25% anual, desde el 1 de agosto de 2017 hasta la fecha de la presentación de la demanda y los que se continuaran acumulando hasta su total y completo pago. Además, reclamó cargos por demora según pactados, más una suma equivalente a $34,114.90, por concepto de costas, gastos y honorarios de abogado. También solicitó al Tribunal que ordenara la ejecución de la hipoteca concernida.

El 8 de enero de 2019, el matrimonio Padilla-De Jesús contestó la demanda e incluyó una reconvención en contra de la institución bancaria. Aceptó algunas alegaciones y negó otras. Entre otras cosas, alegó como defensa afirmativa que en el caso aplicaban las doctrinas de mala fe, manos sucias, actos propios, dolo, engaño y enriquecimiento injusto. Adujo que First Bank realizó actos para que dejaran de pagar el préstamo *so color* de su procedimiento de *loss mitigation* para luego negarle alternativas reales.

En específico, el matrimonio Padilla-De Jesús argumentó que tuvo que mudarse a los Estados Unidos por razones médicas de su hijo menor de edad. Añadió que: (1) en febrero de 2017 notificó a First Bank vía telefónica su situación personal; (2) el 4 de agosto de 2017 se comunicó nuevamente por escrito con el banco en solicitud de que se le permitiera entregar la propiedad en forma de "dación en pago"; (3) remitió otra comunicación al banco el 18 de octubre de 2017 y envió documentos solicitados por el programa de mitigación de pérdidas, a lo cual el 21 de octubre de 2017, First Bank le notificó que la documentación enviada estaba incompleta y solicitaron documentos adicionales; (4) el 8 de noviembre de 2017, First Bank denegó la solicitud bajo el programa de *loss mitigation*; (5) el 2 de enero de 2018, el banco les avisó que la solicitud ya estaba completa y pasarían a evaluación, más, sin embargo, el 15 de marzo de 2018 les dijeron que la solicitud estaba incompleta; (6) el 5 de abril de 2018, se les informó que se denegó la solicitud bajo el *loss mitigation* y estos apelaron al día siguiente; y (7) el 23 de abril de 2018, First Bank nuevamente solicitó documentos adicionales para la evaluación del caso.

Así, el matrimonio Padilla-De Jesús esgrimió que mantuvo un intercambio activo con el banco relacionado al proceso de *loss mitigation* hasta el 2 de mayo de 2018, cuando se le denegó (por segunda ocasión) su petitorio y se le notificó que se encontraba en retraso en los pagos de la hipoteca. Resaltó que todos los esfuerzos realizados para conseguir un acuerdo con el banco resultaron infructuosos por los propios actos dolosos, engaños y un patrón fraudulento de First Bank. Por tanto, solicitó al foro de instancia que declarara ha lugar la reconvención; ordenara a First Bank culminar los trámites para cualificarlo al remedio de dación en pago mediante el programa de *loss mitigation*; condenara al banco al pago de una suma no menor de $100,000.00 por los daños y perjuicios

emocionales, morales y económicos y autorizara el aseguramiento de la sentencia.

First Bank contestó la reconvención el 28 de febrero de 2019. Negó algunas alegaciones y aceptó otras. Adujo que siempre actuó de buena fe y conforme a derecho. Puntualizó que cumplió con su deber de evaluar la solicitud de mitigación de pérdidas y su subsecuente apelación. Enfatizó que no logró un acuerdo con el matrimonio Padilla-De Jesús porque éste no cualificó para las alternativas de mitigación de pérdidas, ello por tener capacidad de repago; no vivían en la residencia y no hicieron gestiones dentro del término requerido para un "*short sale*" al momento de la evaluación. Además, expuso que los daños sufridos por el matrimonio Padilla-De Jesús fueron autoinfligidos al quebrantar sus obligaciones contractuales e hipotecarias. Apuntó que no estaba obligado a cualificar a una parte para las alternativas de mitigación y que, el hecho de que el matrimonio Padilla-De Jesús no cualificó tras un análisis en sus méritos no era razón ni argumento legal para instar una reconvención y/o una solicitud de un remedio en daños.

Tras varios trámites, el 29 de noviembre de 2021, First Bank presentó una *Solicitud de Sentencia Sumaria y Desestimación de Reconvención*.[2] Argumentó que el caso de referencia carecía de hechos sustanciales que estuvieran en controversia y que sólo existen controversias en derecho. Ante ello, esbozó que el Tribunal tenía facultad de otorgar el remedio solicitado de forma sumaria. Especificó que la polémica del caso estribaba en: (1) determinar si el incumplimiento con los términos y condiciones del pagaré hipotecario llevado a cabo por el matrimonio Padilla-De Jesús desde

---

[2] Junto a la solicitud anejó los siguientes documentos: pliego de interrogatorio, solicitud de documentos y requerimiento de admisiones junto a sus correspondientes contestaciones; Pagaré; Escritura de Hipoteca; solicitud de préstamo; varias comunicaciones entre First Bank y el señor Padilla Maiz; Certificación de Propiedad Inmueble; y Declaración Jurada suscrita por Laura Vélez Ojeda, supervisora de ejecuciones y quiebras de First Bank.

el 1 de agosto de 2017 conllevaba el cobro de dinero y ejecución de hipoteca de la propiedad dada en garantía según los términos y condiciones del pagaré y la escritura de hipoteca; y (2) si una propiedad con un préstamo hipotecario garantizado por el Federal Housing Administration (FHA) que no era la vivienda principal del aludido matrimonio, tenía derecho a un segundo proceso de mitigación de pérdidas a tenor con los requerimientos de las legislaciones locales y federales aplicables. Además, el banco incluyó en su comparecencia 14 hechos esenciales y sustanciales sobre los cuales entendía que no existía controversia. En suma, solicitó al foro *a quo* que declarara "ha lugar" su petitorio; dictara sentencia sumaria y desestimara la reconvención.

El 21 de enero de 2022, el matrimonio Padilla-De Jesús incoó su oposición a la solicitud de First Bank.[3] En esencia, discutió que no procedía ninguno de los dos (2) remedios dispositivos requeridos por la institución financiera. Reiteró que existía controversia sobre las alternativas solicitadas y las razones para denegarlas, conforme el Artículo 3 de la Ley Núm. 184 de 17 de agosto de 2012, *infra*. Alegó que el caso de autos era uno "*fact sensitive*", que requería la celebración de un juicio plenario. Además, arguyó que existían cuestiones de credibilidad y asuntos subjetivos sobre daños reclamados en la reconvención que ameritaban dilucidarse mediante una vista en su fondo. Precisó también que procedía denegar la moción de desestimación instada por First Bank, por no cumplir con el estándar jurídico aplicable.

Así las cosas, el 9 de julio de 2024, notificada el 11 del mismo mes y año, el foro *a quo* emitió la *Resolución* que hoy revisamos. Conforme adelantado, el TPI denegó la *Solicitud de Sentencia*

---

[3] Junto a la solicitud anejó los siguientes documentos: pliego de interrogatorio, solicitud de documentos y requerimiento de admisiones junto a sus correspondientes contestaciones; Declaración Jurada suscrita por el señor Padilla Maiz; documentos del *Loss Mitigation Program*; diversos correos electrónicos, así como una *Sentencia* en el caso NSCI2011-00182.

*Sumaria y Desestimación de Reconvención* incoada por First Bank. Dicho foro decretó que existían controversias sobre hechos esenciales que impedían disponer sumariamente de la causa de acción presentada por la institución financiera. En su dictamen, el Tribunal consignó las siguientes determinaciones de hechos materiales sobre los cuales no existía controversia:[4]

1. El 30 de junio de 2015, el Sr. Padilla y la Sra. De Jesús, suscribieron un Pagaré por $341,149.00 a favor de First Bank Puerto Rico, o a su orden, con intereses al 4.25% anual, pactando el pago de una suma igual al 10% de la obligación principal para costas, gastos y honorarios de abogado en caso de reclamación judicial, más una suma equivalente al 4% de cualquier pago que esté en mora por más de quince (15) días desde la fecha de su vencimiento.

2. First Bank Puerto Rico, es la tenedora del Pagaré anteriormente descrito.

3. Mediante la Escritura núm. 244 otorgada en San Juan, Puerto Rico[,] al 30 de junio de 2015 ante el Notario Antonio R. Escriba Oliver se constituyó una hipoteca voluntaria sobre la siguiente propiedad:

   "URBANA: Lote E guión uno (1) de la Urbanización Laderas de San Juan, localizada en el Barrio Caimito del término municipal de San Juan, Puerto Rico, con una cabida de mil ciento cuarenta y dos metros cuadrados con cuatro mil doscientos cincuenta y nueve diez milésimas de otro (1142.4259). En lindes por el NORTE, en una sola alineación de treinta y cuatro punto quinientos doce metros con lote E guion trece (E-13) y lote E guion doce (E-12) de la Urbanización Laderas de San Juan; por el SUR, en varias alineaciones, una de dieciocho punto cuatrocientos veintidós metros (18.422), otra de seis punto doscientos ochenta y cinco metros (6.285) y otra de seis punto doscientos treinta y seis metros (6.236) con calle número cuatro Oeste de la Urbanización Laderas de San Juan; por el ESTE, en varias alineaciones, una de veintitrés punto novecientos cuarenta y seis metros (23.946) y otra de cinco punto trescientos veintiocho metros (5.328) con calle número uno de la Urbanización Laderas de San Juan; y por el OESTE, en una sola alineación de treintiseis punto quinientos metros con lote E guión dos (E-2) de la Urbanización Laderas de San Juan.
   Enclava edificación de dos (2) niveles de forma irregular. Entrada principal mirando hacia el Sur que colinda con la calle número cuatro Oeste de la Urbanización Laderas de San Juan. Tiene sala, comedor, cocina, "family room", patio interior,

---

[4] Notas al calce suprimidas.

cuatro cuartos, dos baños y medio, walk in closet, área de "laundry", marquesina doble y patio. Consta inscrita al folio 125 del tomo 705 de Río Piedras Sur, finca número #20,386, Registro de la Propiedad de Puerto Rico, Sección Cuarta de San Juan."

4. La hipoteca mencionada en el párrafo anterior se constituyó para garantizar el pago del referido pagaré tanto en cuanto a su principal, como en cuanto a sus intereses, los cargos por concepto de mora, la suma estipulada para costas, gastos y honorarios de abogado y las sumas adicionales necesarias para cubrir intereses, además de los garantizados por ley, así como aquellos anticipos que pueda haber hecho el Demandante, ambas iguales al 10% del principal de la obligación.

5. La escritura de hipoteca consta debidamente inscrita en el Registro de la Propiedad de Puerto Rico al folio 138 del tomo 863 de Río Piedras Sur, finca núm. 20,386, Registro de la Propiedad de Puerto Rico, Sección Cuarta de San Juan.

6. Los Demandados, el Sr. Padilla, su esposa, la Sra. De Jesús y la Sociedad Legal de Gananciales Compuesta por ambos, aparecen en el Registro de la Propiedad como titulares del inmueble descrito en el párrafo núm. 3.

7. Según el Registro de la Propiedad, la parte demandada adquirió la propiedad hipotecada por compraventa mediante la Escritura núm. 8, otorgada en San Juan, Puerto Rico, el 18 de febrero de 2003, ante la Notario Mayra García Solá, inscrita al folio 125 del tomo 705 de Río Piedras Sur, finca núm. 20,386, Registro de la Propiedad de Puerto Rico, Sección Cuarta de San Juan.

8. El préstamo hipotecario concedido y otorgado por First Bank a favor de los Demandados es uno garantizado por el Federal Housing Administration (FHA).

9. Los Demandados residen en 558 Tori Court, New Hope, PA 18938.

10. El 26 de marzo de 2018, la parte demandante le envió una carta a la parte demandada donde le informó que esta no cualificó para las alternativas de mitigación de pérdidas.

11. El 2 de mayo de 2018, First Bank le informó a los Demandados que estos no cualificaron para las alternativas de mitigación de pérdidas por tener capacidad de pago.

12. La Cláusula 22 del Contrato de hipoteca dispone que:

"El Prestador cursará notificación al Deudor antes de la aceleración, y luego del incumplimiento por parte del Deudor de cualquier convenio o acuerdo de esta Hipoteca (pero no antes de la aceleración contenida en la

Sección 17, salvo que Ley Aplicable indique lo contrario). La notificación especificará: (a) su incumplimiento; (b) la acción requerida para subsanar tal incumplimiento; (c) una fecha no anterior a treinta (30) a partir del envío por correo del aviso al Deudor, para la cual vendrá obligado a subsanar el incumplimiento; y (d) que la falta de subsanar tal incumplimiento en o antes de la fecha especificada en el aviso podrá resultar en la aceleración de las cantidades garantizadas por esta Hipoteca, la ejecución judicial y la venta de la Propiedad. El aviso también informará al Deudor su derecho a reinstalar el Préstamo después de la aceleración de su vencimiento, y del derecho a alegar en el procedimiento de ejecución la inexistencia del incumplimiento, o cualquier otra defensa que tenga el Deudor.

Si no subsana el incumplimiento en o antes de la fecha especificada en el aviso, el Prestador, a su opción, podrá declarar inmediatamente vencidas y pagaderas todas las sumas garantizadas por esta Hipoteca, sin más requerimiento, y podrá ejecutar esta Hipoteca mediante proceso judicial. El Prestador tendrá derecho a cobrar en tal procedimiento todos los gastos de ejecución, provisto en esta sección 22, incluyendo, sin limitación, honorarios de abogados, el costo de evidencia documentaria, informes y estudios de título, que sean razonables."

En armonía con lo anterior, el Tribunal dispuso que los siguientes hechos estaban en controversia:

1. Si First Bank promovió que los Demandados incurrieran en mora con su préstamo hipotecario como condición para otorgarles un Proceso de Mitigación de Pérdidas.

2. Si First Bank debe cumplir y finalizar con el Proceso de Mitigación de Pérdidas que le otorgó a los Demandados, a pesar de que presuntamente estos no cualifican para dicho proceso.

3. Si el referido Proceso de Mitigación de Pérdidas solicitado por los Demandados es un segundo proceso o si es la continuación del primer proceso en su etapa de revisión/apelación.

4. Si la solicitud de entrega voluntaria (Dación en pago/Short sale) presentada por los Demandados a First Bank, debió ser denegada por el banco por capacidad de pago del deudor hipotecario.

5. Si First Bank le otorgó a los Demandados alternativas reales disponibles en el mercado para poder evitar la ejecución de su hipoteca o la venta judicial de ésta.

El TPI concluyó que el récord era claro al demostrar que la propiedad en controversia perteneciente al matrimonio Padilla-De

Jesús ya no constituía su residencia o vivienda principal para efectos de la Ley Núm. 169 del 9 de agosto de 2016, *infra*, la Ley Núm. 184 de 17 de agosto de 2012, *infra*, y el *Consumer Financial Protection Bureau* (CFPB)[5]. No obstante, el foro de instancia determinó que el matrimonio Padilla-De Jesús tenía derecho a que su propiedad fuera evaluada por First Bank en un proceso de mitigación de pérdidas. Detalló que era un hecho irrefutable que el banco le concedió previamente un proceso de ese tipo, por lo que ahora no podía sostener que no tenía derecho a ello. Dispuso que First Bank no podía ir en contra de sus propios actos y de la buena fe que debe permear en todas las relaciones jurídicas.

En consonancia con lo anterior, el TPI expresó lo siguiente:

[E]l banco tenía conocimiento desde el principio de su relación con los Demandados que el préstamo hipotecario es uno clasificado como FHA; y que al momento de los Demandados acudir a First Bank en búsqueda de alternativas para mitigar su situación con la propiedad hipotecada, estos ya no vivían la propiedad. Aun así, First Bank comenzó el Proceso de Mitigación de Pérdidas a sabiendas de que los Demandados no eran elegibles para dicho proceso.

Ciertamente, el conocimiento técnico y *expertise* lo tiene la institución bancaria. Por lo tanto, el banco no puede ahora alegar que el referido proceso no les aplica a la parte demandada. Los Demandados se sometieron y comenzaron dicho proceso bajo la creencia de poder culminarlo.

Conforme con esto, este Tribunal determina que First Bank no debe ir en contra de sus propios actos. El banco debe proveerle de buena fe un proceso a los Demandados con todas las alternativas reales de mitigación de pérdidas disponibles y brindarle asistencia en el proceso de cumplimentar la solicitud.

La juzgadora de los hechos concluyó que, una vez se dilucidaran en un juicio plenario las controversias sobre hechos esenciales existentes en el caso, procedía analizar si First Bank debía concederle un nuevo proceso de mitigación de pérdidas al matrimonio Padilla-De Jesús.

---

[5] 12 CFR 1024.41 *et seq.*

En desacuerdo, el banco concernido solicitó reconsideración, a lo cual se opuso el matrimonio Padilla-De Jesús oportunamente. El 20 de febrero de 2025, el TPI dictó una *Resolución Interlocutoria* y denegó la solicitud de reconsideración.

Aun inconforme, First Bank presentó el recurso que nos ocupa, en el cual le señala al TPI la comisión de los siguientes errores:

> Erró el TPI al establecer que existe controversia de hecho sobre si FirstBank promovió a que los demandados incurrieran en mora como condición para otorgarles un proceso de mitigación de pérdidas.

> Erró el TPI al establecer que existe controversia de hecho sobre si el proceso de mitigación culminó.

> Erró el TPI al establecer controversia de hecho en cuanto a si FirstBank podía denegar una solicitud de entrega voluntaria ante la capacidad de pago de la demandada-recurrida.

> Erró el TPI al determinar que existe controversia de hecho en cuanto si FirstBank ofreció alternativas reales disponibles en el mercado para evitar la ejecución o venta judicial de la propiedad.

> Erró el TPI al determinar que la oposición al remedio sumario del 21 de enero de 2022, rebatió la prueba documental incluida en la petición sumaria del 21 de noviembre de 2021.

El 21 de abril de 2025, el matrimonio Padilla-De Jesús instó su alegato en oposición. Estamos en posición de resolver.

**II.**

**A.**

El recurso de *certiorari* es el mecanismo procesal idóneo para que un tribunal de superior jerarquía pueda enmendar los errores que cometa el foro primario, sean procesales o sustantivos. *Rivera et al. v. Arcos Dorados et al.*, 212 DPR 194 (2023); *Torres González v. Zaragoza Meléndez,* 211 DPR 821 (2023); *León v. Rest. El Tropical,* 154 DPR 249 (2001). La Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1, dispone taxativamente los asuntos que podemos atender mediante el referido recurso. *Caribbean Orthopedics v.*

*Medshape, et al.*, 207 DPR 994 (2021); *Scotiabank v. ZAF Corp. et al.*, 202 DPR 478 (2019).[6]

Sin embargo, distinto al recurso de apelación, la expedición del auto de *certiorari* está sujeta a la discreción del foro revisor. La discreción consiste en una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión ecuánime. Ahora bien, no significa poder actuar en una forma u otra, haciendo abstracción del resto del derecho, porque, ciertamente, eso constituiría un abuso de discreción. *García v. Padró,* 165 DPR 324, 334-335 (2005).

Así, para que este Foro pueda ejercer con mesura la facultad discrecional de entender, o no, en los méritos, una petición de *certiorari,* la Regla 40 del Reglamento del Tribunal de Apelaciones enumera los criterios que viabilizan dicho ejercicio. En particular, la referida Regla dispone lo siguiente:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

---

[6] El recurso de *certiorari* para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia solamente será expedido por el Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo. No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía o en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. Regla 52.1 de Procedimiento Civil, *supra.*

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

4 LPRA Ap. XXII-B, R. 40.

Los criterios antes transcritos nos sirven de guía para poder, de manera sabia y prudente, tomar la determinación de si procede o no intervenir en el caso en la etapa del procedimiento en que se encuentra. *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 97 (2008). De no encontrarse presente alguno de los criterios anteriormente enumerados en un caso ante nuestra consideración, no procede nuestra intervención.

Además, es importante enfatizar que todas las decisiones y actuaciones judiciales se presumen correctas y le compete a la parte que las impugne probar lo contrario. *Vargas v. González,* 149 DPR 859, 866 (1999).

**B.**

La Regla 36 de Procedimiento Civil dispone el mecanismo extraordinario y discrecional de la sentencia sumaria. 32 LPRA, Ap. V, R. 36. El propósito principal de este mecanismo procesal es propiciar la solución justa, rápida y económica de litigios civiles que no presentan controversias genuinas de hechos materiales, por lo que puede prescindirse del juicio plenario. *Banco Popular de Puerto Rico v. Cable Media of Puerto Rico, Inc. y otro*, res. el 7 de enero de 2025, 2025 TSPR 1; *Serrano Picón v. Multinational Life Ins*, 212 DPR 981 (2023).[7] Los tribunales pueden dictar sentencia sumaria respecto a una parte de una reclamación o sobre la totalidad de esta. 32 LPRA Ap. V, R. 36.1; *Meléndez González v. M. Cuebas*, 193 DPR 100 (2015). La sentencia sumaria procederá si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, junto a cualquier declaración jurada que se presente, si

---

[7] Véase, además: *Oriental Bank v. Caballero García*, 212 DPR 671 (2023); *Ferrer et. al. v. PRTC*, 209 DPR 574, 580-581 (2022); *González Santiago v. Baxter Healthcare*, 202 DPR 281, 290 (2019); *Ramos Pérez v. Univisión*, 178 DPR 200, 213-214 (2010).

alguna, demuestran que no hay controversia real y sustancial sobre algún hecho esencial y pertinente y que, como cuestión de derecho, procede hacerlo. *González Meléndez v. Mun. San Juan et al.,* 212 DPR 601 (2023).

El promovente debe presentar una moción fundamentada en declaraciones juradas o en cualquier evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes sobre la totalidad o parte de la reclamación. 32 LPRA Ap. V, R. 36.1; *Universal Ins. y otro v. ELA y otros*, 211 DPR 455 (2023). La controversia sobre los hechos esenciales que genera el litigio tiene que ser real, no especulativa o abstracta. Es decir, tiene que ser de naturaleza tal que permita concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes. *Ramos Pérez v. Univisión*, supra, págs. 213-214, seguido en *Meléndez González v. M. Cuebas*, supra, pág. 110.[8]

Nuestro estado de derecho le exige al TPI exponer los hechos materiales y esenciales que están en controversia, así como los que no lo están, independientemente de cómo resuelvan una solicitud de sentencia sumaria. *Meléndez González v. M. Cuebas*, supra, pág.

---

[8] Nuestro ordenamiento civil y su jurisprudencia interpretativa dispone que, al momento de presentar una solicitud de sentencia sumaria, se deben cumplir con los requisitos de forma: (1) exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria, (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del Tribunal; (5) las razones por las cuales se debe dictar sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V, R. 36.3; *Pérez Vargas v. Office Depot*, 203 DPR 687 (2019).
Por su parte, le corresponde a la parte promovida refutar dicha moción a través de declaraciones juradas u otra documentación que apoye su posición. Esto es, la parte que se opone debe proveer evidencia sustancial de los hechos materiales que están en disputa. *León Torres v. Rivera Lebrón*, 204 DPR 20 (2020). El hecho de no oponerse a la solicitud de sentencia sumaria no implica necesariamente que ésta proceda si existe una controversia legítima sobre un hecho material. Sin embargo, el demandante no puede descansar en las aseveraciones generales de su demanda, "sino que, a tenor con la Regla 36.5, estará obligada a 'demostrar que [tiene] prueba para sustanciar sus alegaciones'". La Regla 36.5 de Procedimiento Civil, dispone que de no producirse por parte del opositor una exposición de hechos materiales bajo juramento, deberá dictarse sentencia sumaria en su contra. 32 LPRA Ap. V, R. 36.5; *Ramos Pérez v. Univisión*, supra, págs. 215-216.

117. Al evaluar la solicitud de sentencia sumaria, el juzgador deberá: (1) analizar los documentos que acompañan la moción solicitando la sentencia sumaria, los incluidos con la moción en oposición y aquellos que obren en el expediente judicial y; (2) determinar si el oponente controvirtió algún hecho material o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.,* 136 DPR 881, 913-914 (1994).

Por último, en *Meléndez González v. M. Cuebas,* supra, el Tribunal Supremo de Puerto Rico estableció el estándar de revisión que debe utilizar este foro apelativo intermedio al revisar denegatorias o concesiones de mociones de sentencia sumaria. Conforme a ello, debemos utilizar los mismos criterios que los tribunales de primera instancia al determinar si procede dictar sumariamente una sentencia. En esta tarea sólo podemos considerar los documentos que se presentaron ante el foro de primera instancia y determinar si existe o no alguna controversia genuina de hechos pertinentes y esenciales, y si el derecho se aplicó de forma correcta. La tarea de adjudicar los hechos relevantes y esenciales en disputa le corresponde únicamente al foro de primera instancia en el ejercicio de su sana discreción. *Vera v. Dr. Bravo,* 161 DPR 308, 334 (2004). Nuestro Más Alto Foro ha pautado que este Tribunal de Apelaciones se encuentra en la misma posición que el Tribunal de Primera Instancia al momento de revisar solicitudes de sentencia sumaria. *Meléndez González v. M. Cuebas,* supra, págs. 118-119. Es decir, debemos revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho a la controversia. *Íd.*

**C.**

La Ley Núm. 184 de 17 de agosto de 2012, según enmendada, conocida como *Ley para Mediación Compulsoria y Preservación de tu Hogar en los Procesos de Ejecuciones de Hipotecas de una Vivienda*

*Principal*, 32 LPRA secs. 2881–2886 (Ley Núm. 184-2012) se creó para insertar el proceso de mediación compulsorio entre el acreedor hipotecario en los procesos de ejecución de hipoteca (*foreclosure*) de propiedades dedicadas a vivienda en Puerto Rico. Así, se instituyó para proteger la propiedad principal de vivienda en Puerto Rico ante los efectos de la crisis económica que enfrentamos. *Franklin Credit v. George Riviello*, 209 DPR 555, 563 (2022).

La propiedad principal de vivienda es aquella que se usa como hogar principal, no (*second home*), y que para fines de contribuciones sobre bienes inmuebles es la primera residencia o aquella que gozaría de aplicar en cada caso de una exención contributiva. Exposición de Motivos de la Ley Núm. 184-2012. La aludida Ley establece que, en los casos en que un acreedor pueda iniciar una demanda sobre ejecución de hipoteca "de una propiedad residencial que constituya una vivienda principal, se celebrará una reunión compulsoria de mediación". Art. 2(b) de la Ley Núm. 184-2012, 32 LPRA sec. 2881. Nótese que la mediación compulsoria es un requisito jurisdiccional, por lo que, si no se cumple con dicha exigencia no podrá dictarse sentencia ni ordenarse la venta judicial de un inmueble que se utiliza como residencia principal. *Franklin Credit v. George Riviello*, supra, pág. 565. La Ley Núm. 184-2012 no le impone al acreedor la obligación de llegar a un acuerdo con el deudor, sino a notificarle todas las alternativas disponibles para evitar la ejecución de su vivienda principal, actuando de buena fe. *Oriental Bank v. Caballero García*, supra, pág. 682; *Scotiabank v. SLG Rosario-Castro*, 205 DPR 537, 558-559 (2020).

Por otra parte, la Ley Núm. 169 de 9 de agosto de 2016, según enmendada, conocida como *Ley de Ayuda al Deudor* (Ley Núm. 169-2016), 32 LPRA sec. 2891 *et seq.*, se promulgó para que el deudor hipotecario tenga la oportunidad de atravesar por el proceso de evaluación y recomendación de mitigación de pérdidas sin tener la

presión de una demanda judicial por cobro de dinero. En su Exposición de Motivos se dispone que la mencionada Ley se creó:

> [A] los fines de requerir al acreedor de un préstamo hipotecario en mora, que antes de iniciar cualquier proceso legal que pueda culminar en una demanda en cobro de dinero y ejecución hipotecaria, se le ofrezca al deudor hipotecario la alternativa de mitigación de pérdidas (*loss mitigation*) y sólo tras dicho proceso haber concluido en su cabalidad, y el deudor hipotecario conocer si cualifica o no para dicha alternativa, entonces el acreedor hipotecario podrá comenzar un proceso legal ante los tribunales de Puerto Rico.

Es decir, se pretende evitar lo que se conoce en la práctica federal como el "*dual tracking*".

Esta Ley define un deudor hipotecario como una persona natural que ha incurrido en un préstamo de consumo o para propósitos personales garantizado con un gravamen hipotecario sobre su residencia o vivienda principal. Conjuntamente, define residencia o vivienda principal como aquella que se utiliza como el hogar principal del deudor o del deudor y su familia inmediata, y que para fines contributivos sobre bienes inmuebles es aquella para la cual aplicaría la exención contributiva principal. Artículos 2(b) y (c) de la Ley Núm. 169-2016, 32 LPRA sec. 2892.

### III.

En la presente causa, la parte peticionaria esencialmente aduce que el remedio sumario denegado por el TPI contenía la prueba necesaria y requerida por la Regla 36 de Procedimiento Civil para demostrar la inexistencia de hechos en controversia, máxime cuando, a su entender, la oposición de la parte recurrida falló en rebatir la evidencia que obra en el expediente. Particulariza que la decisión impugnada no contiene estatuto legal alguno que apoye la procedencia de las controversias identificadas por el TPI relacionadas al proceso de mitigación de pérdidas. Detalla que la *Resolución* exhibe una contradicción fáctica de los hechos del caso.

Asimismo, la parte peticionaria sostiene que no existe controversia en cuanto a que: (1) concedió y culminó un proceso de mitigación de pérdidas, condicionado a los parámetros establecidos para el tipo de préstamo que tiene la parte recurrida; (2) la parte recurrida ostentaba capacidad de pago para continuar con los pagos de las mensualidades de la obligación que contrajo con el banco y (3) que la parte recurrida quería obligar a la institución financiera aceptar una dación en pago sin antes completar una evaluación de mitigación que exigiera dicha opción en específico. Añade que la alternativa de retención, como la modificación, no está disponible para préstamos FHA cuando la propiedad no constituye la vivienda principal de los deudores. A grandes rasgos, esboza que ante un préstamo FHA y el hecho de que la propiedad estaba vacante al momento de solicitar la mitigación, proveyó a la parte recurrida un proceso de mitigación *bona fide,* el cual concluyó con una denegatoria el 2 de mayo de 2018. Por tanto, entiende que no es correcto establecer que se negó a ofrecer alternativas a la parte recurrida. Incluso, destaca que, aun luego de la denegatoria de 2018, siempre ha estado dispuesta a ofrecer alternativas de mitigación, y que, en el 2024 cursó cuatro (4) misivas a la parte recurrida con diversas opciones, pero no obtuvo respuesta.

A tenor con lo anterior, la parte peticionaria aduce que no promovió a la parte recurrida a incurrir en mora con su préstamo hipotecario. Arguye que ello es un parámetro establecido para que un préstamo garantizado por la FHA pueda conceder una alternativa de disposición como un "*short sale*" y no es un argumento atribuible al banco. Por el contrario, alega que fue la decisión independiente y unilateral de la parte recurrida dejar de pagar su obligación prestamista.

La parte recurrida expresó conformidad con la *Resolución* del TPI. Alega que el foro primario no abusó de su discreción ni actuó

con prejuicio o parcialidad. Arguye que el dictamen en cuestión se dictó conforme a derecho, salvaguardando el debido proceso de ley de las partes y tomando en consideración las circunstancias particulares del caso.

De nuestro análisis *de novo* del petitorio sumario de FirstBank y la oposición del matrimonio Padilla-De Jesús, colegimos que procede nuestra intervención en esta etapa de los procedimientos y revocar la decisión recurrida. Entendemos que la institución financiera incluyó en su solicitud suficiente evidencia que sustenta los hechos materiales de su reclamación. Además, la parte recurrida no logró controvertir, con prueba documental o de otra índole, los hechos alegados por la parte peticionaria en su moción de sentencia sumaria.

Surge con claridad que no existen hechos esenciales en controversia, pues del expediente se desprende que First Bank es el acreedor de la deuda, la cual está vencida, es líquida y exigible, y que el matrimonio Padilla-De Jesús fue evaluado por la división de mitigación de pérdidas del banco, pero estos no cualificaron para alguna alternativa viable. Por ende, First Bank estaba en condición de solicitar la ejecución de la hipoteca.

Es preciso consignar que la prueba que obra en el expediente demuestra que la parte recurrida no cualificaba para el proceso de mitigación de pérdida, toda vez que la propiedad concernida no constituye su residencia principal. Contrario a lo esbozado por el foro de instancia, los cinco (5) hechos materiales que incluyó en la *Resolución* no requieren ser dirimidos en una vista en sus méritos.

Primero, resulta evidente que el banco no promovió que la parte recurrida incurriera en mora con su préstamo hipotecario como condición para otorgarles un proceso de mitigación de pérdidas. Ello es una alegación del matrimonio Padilla-De Jesús que no logró ser probada fehacientemente. Lo cierto es que dicha

decisión fue tomada por el matrimonio Padilla-De Jesús por cuenta propia. Segundo, First Bank no debe cumplir y finalizar con el proceso de mitigación de pérdidas, pues es claro que, según el derecho aplicable, la propiedad concernida no constituye su residencia principal. Aun cuando la parte recurrida no cualificaba para el proceso de *loss mitigation*, el banco evaluó su solicitud. El tercer, cuarto y quinto hecho en controversia establecido por el TPI tampoco debe ser objeto de un juicio en su fondo. Los estatutos legales aplicables, tanto federales como estatales, no le imponen al acreedor la obligación de ofrecer una alternativa de mitigación específica, ni de llegar a un acuerdo con el deudor. Es decir, el deudor no posee un derecho a ello.

En cuanto a la reconvención, entendemos que esta debe ser desestimada. El hecho de que el banco haya sometido a la parte recurrida a un proceso burocrático no necesariamente implica que ello le brinde potestad para instar un pleito sobre daños y perjuicios. El proceso de *loss mitigation* fue concedido de buena fe a la parte recurrida y este ya concluyó con la denegatoria en mayo de 2018. Pero hay más, valga resaltar que, aun luego de instado este pleito, el expediente revela que First Bank le ha ofrecido en diversas ocasiones, entiéndase en el 2021, 2022 y 2024, a la parte recurrida alternativas para trabajar su caso bajo sus programas de Asistencia para Retención del Hogar. Entre los programas que pudieran estar disponibles se encuentran: moratoria, modificación de préstamo, plan de pagos, venta corta (*short sale*), dación en pago/entrega voluntaria y reinstalación. La parte recurrida no puede pretender que debido a que la institución financiera no le concedió previamente la alternativa de dación en pago (la que entienden es la mejor opción), ello es motivo para ser compensado por daños emocionales y económicos.

**IV.**

Por los fundamentos expuestos, se expide el auto de *certiorari* y se revoca la *Resolución* recurrida. Se declara *ha lugar* la *Solicitud de Sentencia Sumaria y Desestimación de Reconvención* promovida por First Bank. En consecuencia, se desestima la reconvención presentada por el matrimonio Padilla-De Jesús.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones